### In the Matter of
### HUGHES–BECHTOL, INC., Debtor.

### OHIO FARMERS INSURANCE COMPANY, Plaintiff,

v.

### HUGHES–BECHTOL, INC., Society Bank, Nat'l Association, City of Greenville, City of Niles, Board of County Commissioners of Greene County, City of Barberton, Ohio, Board of Commissioners of Clermont County, City of Piqua, Ohio Department of Administrative Services, Thomas & Marker Construction Co., Defendants.

**Bankruptcy No. 3–88–02492.
Adv. No. 3–89–0074.**

United States Bankruptcy Court, S.D. Ohio, W.D.

June 29, 1990.

Thomas R. Noland, Dayton, Ohio, for defendant.

Dennis Liston, Lisa A. Weekley, Columbus, Ohio, for plaintiff, Ohio Farmers Ins. Co.

Wayne Dawson, Dayton, Ohio, for defendant, Society Bank, Nat. Ass'n.

John Paul Rieser, Dayton, Ohio, for Unsecured Creditors Committee.

Ronald S. Pretekin, Dayton, Ohio, for defendant, Thomas & Marker Const. Co.

Steven E. Kline, Law Director, City of Piqua, Ohio, for defendant, City of Piqua, Ohio.

J. Terrence Dull, Niles City Law Director, Niles, Ohio, for defendant, City of Niles, Ohio.

Jeffrey L. Amick, Greenville, Ohio, for defendant, City of Greenville.

Thomas M. Rose, Xenia, Ohio, for defendant, Bd. of Greene County Com'rs.

Michael J. McNulty, Barberton, Ohio, for defendant, City of Barberton.

James A. Shriver, Batavia, Ohio, for defendant, Bd. of Clermont County Com'rs.

Don E. Belville, Asst. Atty. Gen., Chief Counsel's Staff, Columbus, Ohio, Ohio Dept. of Administrative Services.

Alexander G. Barkan, Columbus, Ohio, Office of the United States Trustee.

## DECISION ON ORDER ENTERING DECLARATORY JUDGMENT AND GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

THOMAS F. WALDRON, Bankruptcy Judge.

This proceeding arises in a case referred to this court by the Standing Order Of Reference entered in this district on July 30, 1984 and is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)—matters concerning the administration of the estate, (B)—the allowance or disallowance of claims against the estate, (C)—counterclaims by the estate against persons filing claims against the estate, (D)—orders in respect to obtaining credit, (E)—orders to turn over property of the estate, (K)—determinations of the validity, extent or priority of liens, (M)—orders approving the use of property, including the use of cash collateral and (O)—other proceedings affecting the liquidation of

the assets of the estate or the adjustment of the debtor-creditor relationship.

This adversary proceeding was commenced by the plaintiff, Ohio Farmers Insurance Company, *OFIC*, to obtain a declaratory judgment concerning the interest of OFIC and Society Bank, National Association, *Society*, in proceeds, the *disputed funds*, arising out of construction projects, involving the debtor, Hughes–Bechtol, Inc., *HBI*, and the City of Greenville, the City of Niles, the Board of County Commissioners of Greene County, the City of Barberton, Ohio, the Board of Commissioners of Clermont County, the City of Piqua, the Ohio Department of Administrative Services and Thomas & Marker Construction Company, collectively, the *other defendants*.

In addition to filing an answer to OFIC's complaint, HBI also filed a counterclaim, which alleged that OFIC violated the provisions of the automatic stay (11 U.S.C. § 362) and engaged in other inequitable conduct which would require OFIC's claims to be subordinated to all other claims and interest in this bankruptcy. HBI's counterclaim also requested an order determining that the other defendants are released from any claim of OFIC to the disputed funds upon their turnover of these disputed funds to HBI for payment to Society.

The contending parties in this proceeding are HBI, the debtor in possession, OFIC, which supplied payment and performance bonds in connection with the projects involving HBI and the other defendants, and Society, which provided postpetition financing to HBI pursuant to an Order Approving Agreement Of Debtor In Possession To Incur Secured Debt; To Enter Into Post–Petition Finance Agreement; Providing Priority And Liens For Such Financing; Providing Adequate Protection And Use Of Cash Collateral (Doc. 48), the *Cash Collateral Order.*

In accordance with a prior Order (Doc. 47), the contending parties, OFIC, HBI and Society, entered into an agreement which would allow the other defendants "[t]o transfer funds not subject to setoffs, claims or controversies with HBI to an account to be distributed pursuant to an Order of the court and authorizing the court to enter an Order dismissing any defendant who transferred funds to an account to be distributed pursuant to further order of the court." (Doc. 61). The other defendants, with the exception of the Ohio Department of Administrative Services, have paid all, or substantially all, of the disputed funds into an escrow account pursuant to agreed orders filed in this proceeding. Although the court notes that the record is not clear as to the exact amount deposited in the escrow account, nor which portions of such funds are attributable to retentions, progress payments or contract damages, a determination of these issues is not essential to the resolution to the proceedings before the court. *In re Alliance Property, Inc.,* 104 B.R. 306, 311 (Bankr.S. D.Cal.1989), *In re E–R Fegert, Inc.,* 88 B.R. 258, 261 (9th Cir. BAP 1988), *aff'd.,* 887 F.2d 955 (9th Cir.1989).

The pleadings relevant to the disposition of the issues presented in this proceeding are: OFIC's Complaint (Doc. 1), Society's Answer (Doc. 36), HBI's Answer and Counterclaim (Doc. 45), OFIC's reply to HBI's Counterclaim (Doc. 59), Ohio Department of Administrative Services' Reply To Hughes–Bechtol, Inc.'s August 1, 1989 Statement Regarding Funds Remaining To Be Paid (Doc. 65), OFIC's Motion For Summary Judgment (Doc. 69), HBI's Motion For Summary Judgment (Doc. 70), Society's Motion For Summary Judgment (Doc. 71), OFIC's Memorandum (Doc. 75), HBI's Memorandum (Doc. 76), Society's Memorandum (Doc. 77), Society's additional Memorandum (Doc. 87), HBI's additional Memorandum (Doc. 88) and OFIC's additional Memoranda (Doc. 89, Doc. 90, Doc. 91 and Doc. 93).

## PROCEDURAL PRESENTATION

The plaintiff has asserted, and no party has contested, that a declaratory judgment would resolve actual controversies among these adverse parties. The court determines that in this proceeding there is "[a] substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issue of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,*

312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The court notes that the debtor has filed a Plan of Reorganization (Doc. 599) and a Disclosure Statement (Doc. 600) and the court has issued an Order setting hearings on these filings (Doc. 606). The determination in this proceeding will resolve part of these controversies and will be useful in clarifying the legal relationships between the debtor and two of the major creditors in this case. The court further determines that a declaratory judgment would not be used merely for the purpose of "procedural fencing", would not increase friction between Federal and State Courts or improperly encroach upon State jurisdiction; and, there is no alternative remedy which is better or more effective. *Allstate Inc. Co. v. Green*, 825 F.2d 1061, 1065 (6th Cir.1987).

Additionally, each of the contending parties, OFIC, HBI and Society, has requested summary judgment in this proceeding. All of these parties assert that material facts are not in dispute and each claims that it is entitled to summary judgment in its favor. In *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), the Sixth Circuit undertook an analysis of the summary judgment rule (Fed.R.Civ.P. 56, Bankr.R. 7056) and a synthesis of three prior Supreme Court decisions (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In *Street*, 886 F.2d at 1478, the Sixth Circuit noted,

> Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion. If, after a sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby*, criteria, summary judgment is appropriate.

*See also Matter of Sams*, 106 B.R. 485, 491 (Bankr.S.D.Ohio 1989). The issues presented by the contending parties in this proceeding are appropriate for disposition pursuant to the summary judgment rule.

## ISSUES PRESENTED

This proceeding presents the following issues:

*(A) What interests do OFIC, HBI and Society have in the disputed funds; and*

*(B) did any actions taken by OFIC violate the automatic stay?*

## FINDINGS OF FACT

The following findings of fact, which are taken from the uncontested portions of the pleadings, depositions, admissions on file and affidavits, will provide some background information on the parties and issues in this proceeding and provide the basis for the court's conclusions of law:

(1) HBI is an Ohio Corporation engaged in private and governmental commercial construction projects. HBI is often a subcontractor to a general contractor and HBI frequently employs a number of other entities as subcontractors in connection with its construction projects.

(2) A significant number of HBI's projects involve federal and state public works projects, which require HBI to provide payment bonds and performance bonds.

(3) **On August 3, 1988**, HBI filed a voluntary Chapter 11 Bankruptcy Petition.

(4) With the possible exception of one lien claimant (Drasco & Assoc.), there are no statutory lien claimants pursuant to ORC § 1311.26 on any of the projects involving the other defendants.

(5) **Prepetition**, HBI entered into various contracts to perform work on the projects involving the other defendants.

(6) **Prepetition**, HBI entered into performance and payment bonds as principal with OFIC as surety and entered into indemnity agreements with OFIC; and, as a result of financial difficulties, also borrowed funds from OFIC. A proof of claim in the amount of three hundred ninety-eight thousand, eight hundred and

eighty-three dollars and eighteen cents ($398,883.18)—liquidated and twenty-five million, four hundred and forty-six thousand, one hundred and eighty-seven dollars and eighty-two cents ($25,446,187.82) —contingent was filed by OFIC on November 8, 1988.

(7) **Prepetition,** Society, formerly known as the Third National Bank and Trust Company, made various loans to HBI. A proof of claim for three million, six hundred forty-five thousand, two hundred and forty-one dollars and sixty-seven cents ($3,645,241.67)—principal and ten thousand, nine hundred and ten dollars and ninety-eight cents ($10,910.98)—interest was filed by Society on November 10, 1988.

(8) **Prepetition,** although HBI was unable to pay all of its debts as they came due, no other defendant terminated its contract with HBI.

(9) **Prepetition,** with the exception of the defendants Greenville and Piqua, no projects had been completed to the point where all progress payments had been paid and only retainage funds were due HBI from the other defendants.

(10) **Postpetition,** OFIC has paid only the prepetition claims of entities supplying labor and materials to HBI for projects involving the other defendants.

(11) **Postpetition,** Society was unwilling to loan any funds to HBI unless Society would obtain the first priority position in all funds due HBI involving the other defendants.

(12) **Postpetition,** HBI was unable to obtain funding for its continuing operation; however, as a result of an agreement reached between Society, OFIC, and HBI, Society provided postpetition financing to HBI, which allowed HBI to complete the projects, without any postpetition default under any of OFIC's payment or performance bonds on projects involving the other defendants.

(13) On August 10, 1988, HBI filed a Motion For Use Of Cash Collateral, Providing For Adequate Protection Postpetition Financing And Request For Immediate Preliminary Hearing For Payment Of Payroll Due And Current Operating Expenses.

(14) Following the issuance of various notices and following various hearings, on September 1, 1988, the court entered an Order Approving Agreement Of Debtor–In–Possession To Incur Secured Debt; To Enter Into Postpetition Finance Agreement; Providing Priority And Liens For Such Financing; Providing Adequate Protection And Use Of Cash Collateral.

(15) This Cash Collateral Order, which contains the authorized signatures of counsel for HBI, counsel for OFIC, counsel for Society and counsel for the Official Unsecured Creditors Committee, has never been appealed, nor the subject of any motion seeking relief from or any modification of its terms.

(16) Society has received funds paid by the other defendants pursuant to the agreed orders entered in this proceeding and these funds are being held subject to order of this court.

(17) On March 3, 1989, OFIC mailed correspondence to the other defendants (Attachments 1 and 2); however, OFIC had neither filed a motion seeking relief from the stay, nor had it obtained an order granting it relief from the stay.

## DISCUSSION

OFIC, in support of its Motion For Summary Judgment (Doc. 69) argues that the disputed funds belong to OFIC to the extent of OFIC's payments as surety for labor and material on the projects involving the other defendants and, until OFIC receives reimbursement for such payments, none of the disputed funds become property of the estate available for other obligations of HBI. OFIC further argues that projects involving the State of Ohio (Warren Correctional, Project # 307, Barrett, Project # 306 and Holmes, Project # 319), the *Ohio projects*, are subject to specific contractual language creating an express trust on behalf of entities supplying labor and material to the project. OFIC argues that this language provides even further support for its position that funds due on

the Ohio projects never became property of the estate, or, even if these funds became property of the estate, they were impressed with a specific trust preventing these funds from being available for the payment of other claims in this bankruptcy. Additionally, OFIC argues that, as a result of agreements entered into prepetition between Society and OFIC covering projects bonded by OFIC, Society agreed to subordinate to OFIC its otherwise available legal claims to the disputed funds, since OFIC had provided bonds covering these projects. Finally, OFIC asserts that the Cash Collateral Order specifically recognizes OFIC's priority over Society to the disputed funds. This last argument of OFIC is linked to OFIC's primary position that all funds due from the other defendants for work performed by HBI prior to filing bankruptcy are not property of the estate and are not subject to the provisions of the Cash Collateral Order.

With regard to the alleged violation of the automatic stay, OFIC admits it mailed correspondence without obtaining relief from the automatic stay, but argues that mailing the correspondence was not prohibited by any provisions of the automatic stay.

HBI in support of its Motion For Summary Judgment (Doc. 70) argues that the funds due on the projects from the other defendants became property of the estate when HBI filed bankruptcy and are not subject to any equitable lien in favor of OFIC. HBI admits that it had not paid for all of the labor and materials supplied in connection with the projects; however, HBI points out that no entities supplying labor or material, with one possible exception, had obtained any lien rights, nor did any entities obtain any lien rights after the filing of this bankruptcy. HBI argues that OFIC, as surety, can obtain no greater rights than the entity to whose claims it succeeds. Accordingly, the claims of OFIC are general unsecured claims, since, in this bankruptcy, the trustee's powers (11 U.S.C. § 544, § 547 and § 549) limit the claims of all parties supplying labor and materials to the status of unsecured claims. Further, HBI argues that, even to the extent that

funds from the Ohio projects became property of the estate impressed with a specific trust, the funds were not restricted to payments for labor and material exclusively, but, by the specific language of the "trust" for "any and all obligations relating to this contract", which would include salaries of HBI's officers and other employees, overhead expenses, tax payments, etc. Further, HBI argues that the terms of the Cash Collateral Order specifically provide that Society, not OFIC, is entitled to the disputed funds. HBI also argues that even if OFIC, rather than Society, was entitled to the disputed funds, OFIC, as part of the Cash Collateral Order, agreed to defer its receipt of such funds until Society is paid pursuant to the Cash Collateral Order. In addition, HBI argues that OFIC knowingly waived any claim it had; and, as a result of its actions in inducing Society to advance postpetition funds in reliance on its promises, OFIC is equitably estopped from asserting any claim to the disputed funds until Society has been paid.

In support of its counterclaim, HBI argues that OFIC, without first obtaining relief from the automatic stay, mailed correspondence to the other defendant and attempted to exercise control over property of the estate and interfere with HBI's receipt of such funds. HBI contends that OFIC caused HBI to experience delay in the receipt of its payments from the other defendants.

The court notes that HBI and Society, while not sharing identical interests, share allied interests and request similar relief. In support of its Motion For Summary Judgment (Doc. 71), Society argues that the disputed funds are property of the estate. Society also argues that the terms of the Cash Collateral Order provide that Society, rather than OFIC, is entitled to the disputed funds. Further, Society argues that to the extent that OFIC, rather than Society, would have been entitled to the disputed funds at the time HBI filed bankruptcy, pursuant to the specific provisions of the Cash Collateral Order, OFIC has deferred its right to receive such funds until the entire indebtedness due Society

pursuant to the Cash Collateral Order has been paid. Further, Society argues that OFIC cannot collaterally attack the terms of the unappealed Cash Collateral Order. Society also argues that OFIC knowingly waived any claim it had and is estopped from asserting any claim to the disputed funds until Society is paid. Society advances the further argument that the equities in this case favor allowing HBI to use the disputed funds to discharge the obligations to Society pursuant to the Cash Collateral Order, since Society provided the postpetition financing that enabled HBI, without any postpetition defaults, to pay for all necessary labor and materials to complete all of the projects and thus become entitled to receive the disputed funds. Society argues that OFIC signed the Cash Collateral Order that induced Society to lend HBI the funds necessary to complete all of the bonded projects for which OFIC had exposure, not only on its payment bond for labor and materials necessary to complete the projects, but also on its separate performance bond which would have required obtaining another entity to complete the project. Society asserts that only when HBI had obtained the postpetition funds advanced by Society, had completed or substantially completed the projects involving the other defendant and had reduced the significant exposure OFIC faced on its payment and performance bonds, did OFIC claim it was entitled to the disputed funds prior to the payment of Society's claims pursuant to the Cash Collateral Order.

### Property Of The Estate

A significant focus of all of the parties' arguments in connection with the issues in this proceeding has been a discussion of property of the estate. Property of the estate is the subject of 11 U.S.C. § 541 which provides:

(a) The commencement of a case section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsection (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—

(A) under the sole, equal, or joint management and control of the debtor; or

(B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

(4) Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

(5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date—

(A) by bequest, devise, or inheritance;

(B) as a result of a property settlement agreement with the debtors' spouse, or of an interlocutory or final divorce decree; or

(C) as a beneficiary of a life insurance policy or of a death benefit plan.

(6) Proceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

(b) Property of the estate does not include—

(1) any power that the debtor may only exercise solely for the benefit of any entity other than the debtor; or

(2) any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case.

(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

Each party has stressed the words or phrases appearing in the statute that support the result the party seeks. Each party has likewise stressed those cases which support its position, frequently citing cases decided prior to the enactment of § 541 or cases that do not involve Chapter 11 reorganization debtors. No party has cited cases involving cash collateral orders.

In *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), a unanimous Supreme Court declared,

> In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future.... Thus, to facilitate the rehabilitation of the debtor's business, all the debtor's property must be included in the reorganization estate. *Id* at 203, 103 S.Ct. at 2312–13 (citations omitted)
>
> ....
>
> Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate.
>
> The statutory language reflects this view of the scope of the estate.... The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad. Most important, in the context of this case, § 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code. *See* H.R.Rep. No. 95–595, p. 367 (1977). Several of these provisions bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced.
>
> Section 542(a) is such a provision. It requires an entity (other than a custodian) holding any property of the debtor that the trustee can use under § 363 to turn that property over to the trustee.... While there are explicit limitations on the reach of § 542(a), none requires that the debtor hold a possessory interest in the property at the commencement of the reorganization proceedings.

As does all bankruptcy law, § 542(a) modifies the procedural rights available to creditors to protect and satisfy their liens. *Id.* at 204–206, 103 S.Ct. at 2313–2314 (footnotes omitted).

Although the text of the footnotes in connection with the above quotations has been omitted, this court notes that footnote ten (10) contained the explicit statement "We do not now decide the outer boundaries of the bankruptcy estate", forecasting the decision in *Begier v. Internal Revenue Service,* —— U.S. ——, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) in which the court held that funds obtained from employee withholding taxes are trust funds pursuant to a specific federal tax statute and are not property of the estate available for the payment of other claims in the bankruptcy. Additionally, in footnote thirteen (13), the Supreme Court recognized the distinctions not only between the new Bankruptcy Code and the former Bankruptcy Act but also between liquidation proceedings and reorganization proceedings when it stated,

> First, the new Bankruptcy Code abolished the distinction between summary and plenary jurisdiction, thus expanding the jurisdiction of bankruptcy courts beyond the possession limitation. H.R.Rep. No. 95–595, pp. 48–49 (1977); *See Northern Pipeline Construction Co. v. Marathon PipeLine Co.,* 458 U.S. 50, 54, 102 S.Ct. 2858, 2862, 73 L.Ed.2d 598 (1982) (plurality opinion). Moreover, *Phelps* was a liquidation situation, and is inapplicable to reorganization proceedings such as we consider here. *Whiting Pools,* 462 U.S. at 206, 103 S.Ct. at 2314.

■ While it is correct that "[t]he Bankruptcy Code does not define a debtor's interest in property [and] the answer to that question must be made after reference to state law", *In re White,* 851 F.2d 170, 173 (6th Cir.1988), it is also clear that, under Ohio law, HBI had legal title to all of the funds due from the other defendants and this legal title constitutes property of the estate. Without regard to whether Society's postpetition funding enabling the projects to be completed or OFIC's postpetition payments for unpaid prepetition labor and material claims should receive priority in the disputed funds, HBI, alone, had a specific privity of contract relationship with the other defendants. Further, among HBI, OFIC and Society, it is undisputed that only HBI, both prepetition and postpetition, supervised the assembly of labor and materials and the completion of the projects, thereby becoming entitled to the receipt of the unpaid progress payments and the retainage funds, subject to the claims of OFIC and Society.

The court notes that none of the exclusions under § 541(b)(1)—powers exercisable solely for the benefit of an entity other than the debtor, or § 541(b)(2)—leasehold interests, or § 541(c)(2)—spendthrift trusts are applicable to the property at issue in this proceeding. Further, § 541(a)(6) specifically acknowledges property of the estate to include proceeds and profits of or from property of the estate. Additionally, § 541(a)(7) specifically recognizes any interest in property that the estate acquires after the commencement of the case. Accordingly, pursuant to state law and the specific provisions of 11 U.S.C. § 541, HBI's bankruptcy estate contained, at a minimum, a legal interest in all of the disputed funds that had not been paid to HBI at the time this bankruptcy was filed. Thus, it is clear that, as of the commencement of this case, property of the estate included all unpaid funds due from the other defendants, subject to the interests of HBI, whether legal or equitable, the interests of OFIC, whether legal or equitable and the interests of Society, whether legal or equitable. *In re Universal Builders, Inc.,* 53 B.R. 183, 186 (Bankr.M.D.Tenn.1985); *In re Bagwell Coatings, Inc.,* 34 B.R. 193, 195 (Bankr.M.D.La.1983); *In re Glover Const. Co.,* 30 B.R. 873, 881 (Bankr.W.D.Ky.1983); *In re Allgeier & Dyer, Inc.,* 18 B.R. 82, 86 (Bankr.W.D.Ky. 1982); *In re Kuhn Const. Co., Inc.,* 11 B.R. 746, 749–50 (S.D.W.Va.1981).

### The Cash Collateral Order

While it merely states the obvious, it is important to recall that the resolution of the issues presented in this proceeding occurs not exclusively pursuant to applicable

state law, but also pursuant to the provisions of the Bankruptcy Code in a reorganization case in which the contending parties, HBI, OFIC and Society voluntarily entered into a Cash Collateral Order. While applicable state law, *State ex rel. Southern Sur. Co. v. Schlesinger*, 114 O.S. 323, 151 N.E. 177 (Ohio 1926); *Beechwood v. Ohio Cas. Ins. Co.*, 47 Ohio App. 212, 191 N.E. 797 (Ohio Ct.App.1934); *Miami Conservancy Dist. v. New Amsterdam Cas. Co.*, 118 F.2d 604 (6th Cir.1941); *Western Casualty & Sur. v. Brooks*, 362 F.2d 486 (1966); *In re Mid–Valley Contracting Co.*, 24 Ohio Misc. 105, (S.D.Ohio 1970); *United Brotherhood of Carpenters & Joiners v. Paul Lugger Displays*, 2 Ohio App.3d 190, 441 N.E.2d 581 (1981); *Ohio ex rel. Star Supply v. City of Greenfield*, 528 F.Supp. 955 (S.D.Ohio 1981); *Edward v. Aetna Life Ins. Co.*, 690 F.2d 595 (6th Cir.1982); *Federal Ins. Co. v. Fifth Third Bank*, 867 F.2d 330 (6th Cir.1989), provides a predicate to the resolution of the issues presented in this proceeding, as a result of the provisions of the Cash Collateral Order, state law alone does not control the determination of the issues in this proceeding.

If the contending parties' rights remained the same *postpetition* as they were at the commencement of the case applicable state law principles would provide a resolution of this proceeding by recognizing OFIC's equitable lien claims arising from its payments as surety under its payment bonds and Society's agreement to subordinate its otherwise available claims in favor of OFIC on all of the funds due prepetition from the other defendants. In a postpetition factual setting where none of the parties altered their rights, OFIC would have been entitled to the disputed funds arising from the individual projects of the other defendants to the extent that OFIC made payments under its bonds; however, that is not the postpetition factual setting in this bankruptcy. As a result of the Cash Collateral Order, voluntarily entered into by HBI, OFIC and Society, the parties themselves altered their otherwise available rights to the disputed funds.

As the Supreme Court noted in *Whiting Pools, supra*, the intention of Congress in connection with Chapter 11 was to allow a troubled enterprise to be restructured so that it could operate successfully in the future; however, until the enterprise can be reorganized, the debtor in possession must be able to continue the operation of the business, including obtaining an infusion of new capital. As the Sixth Circuit stated in *In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 603 (6th Cir.1987),

> Chapter 11 envisions the continued operation of a debtor's business, but the need for fresh capital and difficulties in obtaining the capital and wherewithal to run a business are obvious. Lenders and suppliers are understandably reluctant to do business with a debtor who is in bankruptcy and who may have few, if any, unencumbered assets to offer as collateral. Section 364 is designed to encourage postpetition financing by authorizing security in the debtor's assets and giving the lender priority over administration costs. It provides for approving such loans on an expedited basis after notice and a hearing. Subsection (e), in turn, protects the authorization for priority on a lien from reversal or modification on appeal, as long as the order has not been stayed pending appeal and the creditor extended credit in good faith.

As the court has previously noted, the Cash Collateral Order was not the subject of an appeal (Bankr.R. 8001, 8002), nor has it been the subject of a motion seeking any relief or modification (Bankr.R. 9024). Further, it must be recalled that after multiple notices concerning a proposed Cash Collateral Order, multiple hearings concerning a proposed Cash Collateral Order and multiple objections and negotiations among the parties concerning a Cash Collateral Order, an *agreed* Cash Collateral Order was submitted and entered in this bankruptcy. This agreed Cash Collateral Order, developed through negotiation and bargaining among the parties, is subject to consideration and analysis under principles applicable to consent decrees. As the Supreme Court noted in *United States v. Armour & Co.*, 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971),

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation (footnote omitted).

As the Sixth Circuit specifically noted in connection with the provisions of a Cash Collateral Order in *MacLean Oil Co.*, 834 F.2d at 604.

In this situation the bankruptcy court should not be required to scrutinize carefully the legal arguments made and the position of the parties with respect to a new and amended loan agreement. The bankruptcy court thus did not violate the Supreme Court's mandate requiring strict scrutiny of settlements in bankruptcy (citation omitted).

Postpetition financing orders obtained pursuant to 11 U.S.C. § 364 are quite clearly unique and extraordinary orders. Directly consistent with the Supreme Court's observation in *Whiting Pools*, 462 U.S. at

206, 103 S.Ct. at 2314 that provisions of the Bankruptcy Code modify "[t]he procedural rights available to creditors to protect and satisfy their liens", § 364 can significantly alter not only creditors' rights to obtain and satisfy their liens, but even alter the otherwise applicable provisions of the Bankruptcy Code establishing priorities for the payment of claims. (11 U.S.C. § 503(b) and § 507(b)). The Sixth Circuit has given full effect to the language and intention of § 364(c) and stated, *"[e]ven if the order were interpreted to exceed the scope of § 364(c), however, we are aware of no case authority holding that § 364(e) protection is unavailable to orders purportedly granted under § 364(c) but determined to have exceeded § 364(c)'s scope."* (emphasis added) *MacLean Oil Co.*, 834 F.2d at 602.

Turning then to the various relevant provisions of the Cash Collateral Order, the court notes that the Cash Collateral Order approves an attached Amended Agreement For Use Of Cash Collateral, Adequate Protection, And Post–Petition Financing and contains an acknowledgement that

3. It further appearing that said indebtedness is secured by a security interest and a lien against all of Debtor's and/or Debtor–In–Possession's accounts receivable, inventory, equipment, machinery, furniture, fixtures, rolling stock, including motor vehicles, as well as a mortgage on real estate owned by H.B. Milo, Corporation and also subject to the limited guaranty dated August 1, 1986 of Guarantor hereafter referred to as "Pre–Filing Collateral" and described more fully in the Amended Agreement, with subordination language regarding accounts receivable as to bonded jobs as to Ohio Farmers Insurance Co. ("OFIC") or its successors as evidenced by financing statements filed February 4, 1985 and February 6, 1985.

The Cash Collateral Order additionally provides:

4. It appearing that Debtor–In–Possession is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankrupt-

cy Code to provide for its continued operations. It appearing that Debtor–In–Possession and the Bank and OFIC have reached agreement regarding issues of cash collateral usage, adequate protection as to cash collateral usage and the incurrence of secured, priority and administrative indebtedness under § 364(c) of the Bankruptcy Code, securing full payment to the Bank of all debts, obligations and other liabilities; by granting Bank a first lien and security interest in all accounts receivable, inventory general intangibles, choses in action; machinery, equipment, furniture and fixtures and rolling stock now owned or hereafter acquired, including proceeds and product of the foregoing subject to the retained rights of OFIC pursuant to the previously mentioned subordination by the bank and the granting of an open end mortgage on real estate owned by H.B. Milo Corporation, filed in Montgomery County Recorders Office on December 29, 1987.

5. It appearing that the Debtor–In–Possession does not have sufficient funds or working capital with which to continue its operation without the use of its inventory and accounts receivable and other Pre–Filing Collateral in which the Bank has a security interest and which, in part, constitutes cash collateral under Section 363 of the Bankruptcy Code.

9. **IT IS ORDERED** that the payment to the Bank of all debts, obligations and other liabilities including, but not limited to, those which arise in or result from the Amended Agreement be, and they hereby are, secured by a first lien and security interest in the property described in the Amended Agreement, including all of the accounts receivable, inventory, general intangibles, choses in action, machinery, equipment, furniture and fixtures, and rolling stock, including motor vehicles, now owned or hereafter acquired, including the proceeds and products of any of the foregoing, and including the continuing open-end mortgage against real estate owned by H.B. Milo, Corporation, subject to the right of the counsel for the Official Creditors' Committee to take timely action on or before November 10, 1988 to challenge the validity, perfection and enforceability of any such liens held prepetition by the Bank or the allowable amount of the Pre–Petition Indebtedness owing to the Bank;

11. **IT IS FURTHER ORDERED** that the security interest and liens granted herein to the Bank in prepetition property of the debtor or the estate shall be subject to any rights OFIC has as a result of the subordination language regarding accounts receivable on bonded jobs found in Exhibit "A" to the financing statements filed February 4, 1985 and February 6, 1985, issued by debtor to the Bank;

12. **IT IS ORDERED** that the security interests and liens granted herein in all post-petition accounts receivable, including those on jobs bonded by OFIC, shall be free from any claims of OFIC; until such time OFIC declares a post-petition default in performance by Debtor–In–Possession and Debtor–In–Possession stops performance on said job. Subject to those conditions, OFIC shall have the right to enforce any subordination rights it possesses against remaining accounts receivable on bonded jobs due Debtor–In–Possession upon such terms and conditions to be reached between the Bank and OFIC. It is agreed that in any case, OFIC shall retain its subordination rights as to all extra work claims resulting from the litigation pending on the Wright Patterson Air force Base ceramics lab job.

13. **IT IS ORDERED** that the indebtedness of the debtor to the Bank existing as of the date of filing of the petition under Chapter 11 and such indebtedness of the Debtor–In–Possession as may accrue by virtue of loans and advances made pursuant to this Order and previous Interim Orders shall be combined and merged so that the account indebtedness of the debtor and Debtor–In–Possession shall be reflected as a single indebtedness owing by the debtor and Debtor–In–Possession to the Bank secured by all the collateral, as referred to

and qualified in paragraph 9, 10, 11, and 12, acquired and granted by the debtor and the Debtor–In–Possession;

14. **IT IS ORDERED** that pursuant to Sections 364(c), 507(b), 503(b) and 364(c)(1) of the United States Bankruptcy Code, any and all obligations and liabilities of the debtor and Debtor–In–Possession to the Bank shall have priority in payment over any other debts or obligations now in existence or incurred hereafter by the debtor or Debtor–In–Possession and over all costs and expenses of administration of this or any subsequent proceeding, including liquidation in bankruptcy, except for the sums required to pay the following expenses, which will have the highest priority and which the Bank will provide Debtor–In–Possession funds to pay: (i) compensation and reimbursement awarded under Section 330(a) of the Bankruptcy Code to the counsel for the Debtor–In–Possession, Thomas R. Noland, Case Attorney, Altick & Corwin of Counsel, as allowed by the Court (ii) the amount equal to one weeks gross payroll for the employees and officers of the debtor earned and unpaid at the filing of the petition, (iii) normal gross payroll for Debtor–In–Possession employees, earned and unpaid, after the filing for relief while Debtor–In–Possession is not in default of the Amended Agreement and demand for payment on the Merged Indebtedness has not been made. Normal gross payroll includes vacation, sick leave, and health and other group insurance benefits, but excludes severance, and any other benefits;

15. **IT IS ORDERED** that the provisions of this Order shall survive entry of any subsequent Order. The provisions of this Order, as well as the Merged Indebtedness and security interests arising pursuant to it in favor of the Bank shall continue in these and any superseding proceedings under the Bankruptcy Code and such liens and security interests shall maintain their priority as provided for under this Order until the underlying obligations are fully satisfied;

16. **IT IS ORDERED** that the security interests granted or regranted by this Order be, and hereby are, deemed perfected without the necessity of filing any documents otherwise required under non-bankruptcy law for perfection of security interests;

18. **IT IS ORDERED** that the security interests granted herein shall relate back to the date of the filing of the petition initiating the Chapter 11 case;

21. **IT IS ORDERED** that all cash received from accounts receivable or other assets of the debtor or Debtor–In–Possession since filing, be and hereby are directed to be placed in appropriate accounts to be maintained at the Bank, unless the Bank shall otherwise consent to accounts at other banks, to be applied for debtor and Debtor–In–Possession's obligations to the Bank;

The parties, emphasizing different provisions of the Cash Collateral Order, reach different conclusions concerning the disposition of the funds due from the projects of the other defendants. OFIC urges Paragraph 11 as the controlling provision in the document. Specifically OFIC argues that, prepetition, Society and OFIC entered into a subordination agreement concerning accounts receivable on projects bonded by OFIC, and, since the Cash Collateral Order refers to that prepetition subordination agreement, OFIC, not Society, is entitled to the proceeds from the projects of the other defendants.

OFIC's position would be more tenable if Paragraph 11 was the only provision in the Cash Collateral Order. Society points out that provision twelve (12) specifically provides that the security interests and liens granted herein in all postpetition accounts receivable, including those on jobs bonded by OFIC, shall be free from all claims of OFIC, unless OFIC declares a postpetition default and the debtor in possession stops performance on a particular job. It is conceded that OFIC has not declared any postpetition default, nor has the debtor in possession stopped performance on any job. Paragraph 12 also specifically provides that "[i]n any case, OFIC shall retain its subor-

dination rights as to all extra work claims resulting from the litigation pending on the Wright Patterson Air Force Base Ceramic Lab Job."

In examining the Cash Collateral Order, the court determines that the overall structure and the specific provisions contain unambiguous terms that allow the court to determine its intent and effect. The Cash Collateral Order contains a structure frequently found in legal documents in which the parties first broadly describe an asset or item by using all-encompassing language and, thereafter, modify this all-encompassing language in the remainder of the provision to exclude a specific item from the coverage of the provision, or to recognize a party's specific right concerning the item covered by the provision.

Paragraph 13 uses this all-encompassing language to merge all indebtedness due Society into a single indebtedness under the terms of the Cash Collateral Agreement; and, significantly, contains no exclusions from this all-encompassing language.

Paragraph 14, using all-encompassing language, provides that *"[a]ny and all obligations and liabilities of the debtor and Debtor–In–Possession to the Bank shall have priority in payment over any other debts and obligations now in existence or incurred hereafter by the debtor or Debtor–In–Possession and over all costs and expenses of the administration of this or any subsequent bankruptcy, including liquidation in bankruptcy,"* (emphasis added); and, thereafter, contains certain exclusions; however, none of the exclusions refer to any debts or obligations owed to OFIC. The excluded obligations relate solely to payments to counsel for the debtor in possession and certain other expenses of the debtor. Clearly, there were debts and obligations due from HBI to OFIC and these "debts and obligations" were "in existence" at the time of the Cash Collateral Order. In fact, these debts and obligations due from HBI to OFIC formed the basis for OFIC's payments on the material bonds and the basis for OFIC's claims to the disputed funds. Again, significantly, after using all-encompassing language,

there are no exclusions from the priority granted to Society for the payment of the merged indebtedness under the Cash Collateral Order, nor is any reference made to any subordination agreements between OFIC and Society as an exclusion, nor is any reference made to any other provision of the Cash Collateral Order as an exclusion.

Finally, Paragraph 21, again, using all encompassing language provides that *"[a]ll cash received from accounts receivable or other assets of the debtor or Debtor–In–Possession since filing,"* unless otherwise consented to by the bank are to be *"[a]pplied for debtor and Debtor–In–Possession's obligations to the Bank".* Again, there are no exclusions for any funds due for worked performed by HBI prior to filing bankruptcy, or funds due OFIC under any equitable lien claims, nor under any prepetition subordination agreements between Society and OFIC, nor any other exclusion that would permit any entity to receive any funds until the amount due Society pursuant to the Cash Collateral Order is paid.

■ The court determines that the language and structure of the agreement is also consistent with Society's position that in order to provide postpetition financing to the debtor, Society required assurance that it would receive all proceeds on any projects where funds remain unpaid. Society recognized that OFIC retained a great deal of control over the ability of HBI to continue working on the projects of the other defendants, even with Society's postpetition financing, because OFIC retained the legal authority to declare a default under the terms of its bonds. Society also recognized that it had entered into prepetition agreements under which Society subordinated its interests to OFIC on accounts receivable involving projects in which OFIC provided bonds on behalf of HBI. Accordingly, Society determined that it would only provide postpetition financing if it could protect itself in these two areas. It determined that it could protect itself against OFIC declaring a bond default by adding a provision to the Cash Collateral Order that

required HBI must actually stop work on an existing project before a default could be declared (Cash Collateral Order, Provision 12). OFIC continues to attempt to present its alleged failure to agree to the precise terms of the default language in Provision 12 as an issue in this proceeding; however, even if OFIC did not agree to the default language, OFIC never appealed the Cash Collateral Order, never moved to vacate or modify the Cash Collateral Order, HBI never stopped performance and, finally, OFIC never declared a default on any project. There is no merit to OFIC's assertions concerning its alleged failure to agree to the specific language of Provision 12.

Society determined it could protect itself with regard to receipt of all unpaid proceeds, whether prepetition or postpetition, including any bonded projects involving OFIC's claims pursuant to the prepetition OFIC–Society subordination agreement, any equitable lien claims, or any other claims, by including provisions in the Cash Collateral Order which would establish Society's exclusive first priority position to receive all such funds until all amounts due pursuant to the Cash Collateral Order had been paid.

The court's reading of the Cash Collateral Order is also consistent with OFIC's desire to be certain that the Cash Collateral Order did not detract from OFIC's prepetition position. It was clear that the Unsecured Creditors' Committee asserted that OFIC's prepetition rights were only the rights of an unsecured creditor. The Cash Collateral Order reflects that all parties agreed that OFIC would retain its prepetition rights involving bonded jobs, provided any indebtedness due Society under the Cash Collateral Order had been paid.

Simply put, the overall structure and the specific provisions of the Cash Collateral Order result in a determination that OFIC deferred all of its otherwise available claims to the disputed funds until the total indebtedness due Society was paid.

### Waiver And Estoppel

Additionally, settled doctrines of *waiver* and *estoppel* prevent OFIC from receiving any funds from the other defendants until the indebtedness due Society pursuant to the Cash Collateral Order is paid.

Although the same or similar facts may establish either waiver or estoppel, they are distinct legal doctrines. Waiver is an entity's intentional relinquishment of a known right, either expressly or by conduct inconsistent with an intent to enforce the right, and focuses on the intention of the entity. Estoppel, however denominated, arises when an entity's conduct misleads another party into believing that the entity's right will not be enforced and, as a result, causes the other party to act to its detriment in reliance on this belief, and, focuses on the effects of the entity's conduct on the other party. *In re Hartley*, 52 B.R. 679, 685 (Bankr.N.D.Ohio 1985); *In re Nyack Autopartstores Holding Co., Inc.*, 98 B.R. 659, 663 (Bankr.S.D.N.Y.1989); *In re Republic Fabricators, Inc.*, 104 B.R. 933, 947–948 (Bankr.N.D.Ind.1989); *In re Davis*, 105 B.R. 288, 294 (Bankr.W.D.Pa. 1989); *Warpar Mfg. Corp. v. Ashland Oil, Inc.*, 606 F.Supp. 852, 858 (1984); *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 1000 (7th Cir.1980); *Mitchell v. Aetna Cas. & Sur. Co.*, 579 F.2d 342, 347 (5th Cir.1978); *Olsons Distrib. Systems, Inc. v. Glasurit America, Inc.*, 850 F.2d 295, 296 (6th Cir.1988); *American Hardware Mut. Ins. Co. v. BIM, Inc.*, 885 F.2d 132, 138 (4th Cir.1989).

OFIC was clearly aware, both prepetition and postpetition, particularly during the negotiations leading up to the agreed Cash Collateral Order, that it had certain legal and equitable rights in connection with funds due from projects involving the other defendants. The agreed Cash Collateral Order provides recognition of OFIC's rights in paragraph eleven (11), and protects certain of these rights by excluding certain claims (the Air Force Ceramics Lab) from the priority position granted Society by the Cash Collateral Order. Accordingly, with full knowledge of its rights and with knowledge of the stated exclusion of only certain of these rights, OFIC waived all other claims it had to the funds due from the other defendants by agreeing that "[t]he Bank shall have priority in pay-

ment over any other debts or obligations now in existence or incurred hereafter by the debtor or Debtor–In–Possession" and by not including any claims of OFIC among the expenses "[w]hich will have the highest priority and which the bank will provide Debtor–In–Possession funds to pay: (Provision 14, Cash Collateral Order). This waiver by OFIC to any funds due from the other defendants until the indebtedness to Society under the terms of the Cash Collateral Order is paid is further evidenced by OFIC's agreement that "[a]ll cash received from accounts receivable or other assets of the debtor or Debtor–In–Possessions since filing" will be placed in accounts with Society "[t]o be applied for debtor and to Debtor–In–Possession's obligations to the bank." (Provision 21, Cash Collateral Order).

Further, principles of estoppel prevent OFIC from receiving the funds due from the other defendants until the indebtedness due Society is paid. It is uncontradicted that, postpetition, HBI would have been unable to continue in business and, accordingly, unable to complete any of the projects involving the other defendants. A direct and immediate consequence of the inability of HBI to continue in business would have been postpetition defaults on the projects of the other defendants. This would have created an immediate obligation on the part of OFIC, pursuant to its payment bonds and performance bonds, to incur significant costs to complete these unfinished projects involving the other defendants. OFIC's proof of claim listed over $25,000,000.00 in contingent liabilities. OFIC chose not to extend any postpetition financing to HBI; nevertheless, OFIC did engage in conduct to induce Society to extend postpetition financing to the debtor. It is clear from the uncontradicted affidavits and other materials that, but for the conduct and inducement of OFIC, Society would not have been willing to extend postpetition financing to HBI. Society had reason to rely on OFIC's conduct and inducements in connection with funding OFIC. Society and OFIC had a prepetition history of "switching priority positions" regarding claims to funds generated by HBI. HBI

has now completed these projects. The Cash Collateral Order simply provides that OFIC would defer its claim to any funds due from these projects until the entire indebtedness to Society was paid.

Finally, it is worthy to note that arguments advanced by all parties in this proceeding are arguments based in equity. OFIC augments its legal arguments concerning prepetition subordination agreements by asserting equitable lien claims; and, it is not disputed that OFIC has paid prepetition claims involving labor and material which HBI failed to pay. Society augments its legal arguments concerning the terms of the Cash Collateral Order by asserting equitable principles of waiver and estoppel; and, it is not disputed that as a result of Society's postpetition financing, HBI completed the projects, committed no postpetition defaults requiring OFIC to make any payment in connection with its payment or performance bonds on any projects involving the other defendants and, thus, earned the disputed funds. The court determines that, to the extent there are competing, compelling equitable arguments advanced by the parties, as a result of OFIC's actions and agreements which induced Society to provide postpetition financing to HBI pursuant to the agreed Cash Collateral Order, OFIC is equitably estopped from asserting a claim to the funds due from the other defendants until the indebtedness due Society pursuant to the Cash Collateral Order is satisfied.

## THE AUTOMATIC STAY

Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The court recognizes that while the automatic stay may adversely impact on the substantive rights of creditors, the purpose of the automatic stay, is not substantive, but procedural. The automatic stay is intended as a form of procedural protection under which the debtor in a reorganization case can prepare and present a proposed plan free from unauthorized creditor pressure. The purpose of the automatic stay is

not to ultimately determine the substantive rights of any party, nor to ultimately prevent the exercise of the available rights of any party. A great number of the actions prohibited by the automatic stay (seizures, foreclosures, statutory notices and demands) may be permitted when the automatic stay no longer applies. It is, however, the purpose of the automatic stay, during its pendency, to prevent any creditor from becoming a self-determining arbiter of what constitutes property of the estate and what actions are permitted or prohibited by the stay. *In re Smith*, 876 F.2d 524, 525–26 (6th Cir.1989). *Accord Matter of Brock*, 58 B.R. 797, 804 (Bankr.S.D.Ohio 1986)

The Bankruptcy Code interfaces with a wide variety of commercial and legal relationships. Invariably, this results in at least a delay in the exercise of otherwise available nonbankruptcy remedies and rights, and in some instances, the impairment or loss of otherwise available nonbankruptcy remedies and rights. These results, while understandably unsatisfactory to individual creditors, comprise a portion of the overall Congressional allocation of economic risks in connection with bankruptcy legislation. Congress placed the court at the vortex of bankruptcy proceedings and the provisions of the automatic stay are designed as the initial channels that regulate the flow of economic consequences, which, if left unchecked or diverted by extra judicial determinations, would drown a debtor's opportunity for a fresh start and would destroy a creditor's opportunity to receive its hierarchically ordered claim to a pro rata share of the bankruptcy estate. Unless a particular proceeding is specifically designated an exception to the automatic stay (§ 362(b)), a creditor is obligated to obtain relief from the stay *prior* to taking any action involving property of the estate. To the extent creditors fail to do so, they act at their own peril.

At the same time, this court recognizes that there are decisions which have held that, absent coercion or harassment, mildly worded correspondence which does not adversely impact on the estate, does not constitute an actionable violation of the automatic stay. Correspondence which is isolated and informational is less likely to result in a violation of the automatic stay than correspondence which is repetitive and requests payment. The resolution of such an issue is always a fact sensitive determination based on a consideration of the totality of the circumstances. *Morgan Guar. Trust Co. v. The American Sav. and Loan Ass'n*, 804 F.2d 1487, 1491 (9th Cir.1986); *See also In re Callender*, 99 B.R. 378, 379–380 (Bankr.S.D.Ohio 1989); *accord Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81 (3rd Cir.1988).

■ In this particular proceeding, the court notes that the correspondence from OFIC (Attachments 1 and 2), although mailed to each of the other defendants, was a non-repetitive single mailing that was predominately informational; however, it is also impossible not to recognize that the concluding paragraph of the correspondence is much less an attempt to convey information and much more an attempt to exercise control over the proposed distribution of the disputed funds. The court further notes that, with the exception of the Ohio Department of Administrative Services, all of the other defendants have paid the disputed funds to the escrow account established during this proceeding.

It is difficult for this court to understand why OFIC, which appeared in numerous proceedings in this bankruptcy and filed numerous documents and requests for relief, would have failed to seek a court determination of the extent of the automatic stay prior to taking the action complained of; nevertheless, the court concludes that the mailing of the non-repetitive, predominately informational correspondence, which in this motion for summary judgment has not been demonstrated to have adversely impacted on the estate, does not constitute a violation of the automatic stay.

This determination is not meant to express approval of OFIC's actions, nor to encourage OFIC to commence or continue any other actions impacting on property of the estate without relief from the stay. Further, this determination would not pre-

vent HBI from instituting future proceedings against OFIC based on other claimed violations of the automatic stay.

## CONCLUSIONS OF LAW

Accordingly, the court will enter declaratory judgment and grant and deny summary judgment as follows:

1. all funds due at the time HBI filed bankruptcy involving projects of the other defendant constitute property of the estate in which HBI, OFIC and Society have legal and equitable interests; and,

2. as a result of the provisions of the Cash Collateral Order, OFIC deferred the receipt of funds due it pursuant to its otherwise available legal and equitable rights until Society received full payment pursuant to the terms of the Cash Collateral Order; and,

3. all of the other defendants, which have not previously done so, are required to turnover to Society all funds which are due to HBI and are released from any claims of OFIC to these funds; and,

4. the correspondence dated March 3, 1989, mailed by OFIC to the other defendants, does not constitute an actionable violation of the automatic stay.

Although this decision resolves several significant issues presented in this proceeding, a number of other issues still remain. Accordingly, the court has issued a separate order requiring certain filings and setting a pretrial conference.

Orders in accordance with this decision are simultaneously entered.

SO ORDERED.

APPENDIX

**Westfield Companies**
INSURANCE SINCE 1848

(216) 887 0669

March 3, 1989

Board of Commissioners
Clermont County Ohio
76 South RIverside Drive
Batavia, Ohio   45103

Re:   Bond No.   525 589
      Principal - Hughes-Bechtol, Inc.
      Obligee - Clermont County Commissioners
      Description - Middle East Fork Regional Wastewater Treatment
                    Plant, Contract S-41D (Electrical)

Gentlemen:

The Ohio Farmers Insurance Company is the surety for Hughes-Bechtol, Inc. on the above contract.  Hughes-Bechtol, Inc. has failed to pay for certain labor and material which it used in the performance of work on the above contract.  The creditors who supplied the labor and material have made claim against the contract bond executed by Ohio Farmers Insurance Company as surety and Hughes-Bechtol, Inc. as principal.

Ohio Farmers Insurance Company has paid  $10,721.48   to those claimants and may receive further valid claims.  Ohio Farmers therefore believes it has a direct right, up to the amount which it may pay, to receive prepetition contract funds, including retainage, which would have been earned by Hughes-Bechtol, Inc. if it had paid the claimants. (Ohio Farmers anticipates that Hughes-Bechtol, Inc. or others will disagree and contend that all contract funds belong to the bankruptcy estate.)

Whatever others contend, Ohio Farmers Insurance Company believes that it will continue to have a claim against you for these funds if you take any action which prejudices Ohio Farmers Insurance Company's rights to the funds.

Sincerely,

James M. Walker
Assistant Bond Claim Counsel

JMW:bh

Ohio Farmers Insurance Co.
Westfield Insurance Co.     Westfield National Insurance Co.
Westfield Life Insurance Co.

Westfield Center, Ohio 44251     216/887 0101

**Westfield Companies**
INSURANCE SINCE 1848

(216) 887 0669

//ATTACHMENT (2)

March 3, 1989

City of Piqua
919 Main Street
Piqua, Ohio 45356

Attention:  RIchard L. Miller

Re:   Bond No. 538 162
         Principal - Hughes-Bechtol, Inc.
         Obligee - City of Piqua
         Description -  Installation of District Steam Distribution
                              System COntract No. 8524-00-03

Dear Mr. Miller:

The Ohio Farmers  Insurance Company is the surety for Hughes-
Bechtol, Inc. on the above contract.  Hughes-Bechtol, Inc. has
failed to pay for certain labor and material which it used in the
performance of work on the above contract.  The creditors who
supplied the labor and material have made claim against the
contract bond executed by Ohio Farmers Insurance Company as surety
and Hughes-Bechtol, Inc. as principal.

Ohio Farmers Insurance Company has received valid claims in
excess of the $10,000 remaining in the above contract, and may
receive further valid claims.  Ohio Farmers therefore believes
it has a direct right, up to the amount which it may pay, to
receive prepetition contract funds, including retainage, which
would have been earned by Hughes-Bechtol, Inc. if it had paid the
claimants. (Ohio Farmers anticipates that Hughes-Bechtol, Inc. or
others will disagree and contend that all contract funds belong
to the bankruptcy estate.)

Whatever others contend, Ohio Farmers Insurance Company believes
that it will continue to have a claim against you for these funds
if you take any action which prejudices Ohio Farmers Insurance
Company's right to the funds.

Sincerely,

James M. Walker
Assistant Bond Claim Counsel

JMW:bh

Ohio Farmers Insurance Co.
Westfield Insurance Co.     Westfield National Insu ance Co.
Westfield Life Insurance Co.

Westfield Center, C io 44251     216/887-0101