**Slip Op. 04-37**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, SENIOR JUDGE**

| | |
|---|---|
| HYUNDAI ELECTRONICS INDUSTRIES CO., LTD. and HYUNDAI ELECTRONICS AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> MICRON TECHNOLOGY, INC. <br><br> Defendant-Intervenor. | **PUBLIC VERSION** <br><br> Cons. Court No. 00-01-00027 |

[Plaintiffs' motion for judgment on agency record is granted in part and denied in part.]

Date: April 16, 2004

Willkie, Farr, & Gallagher (Christopher A. Dunn, James P. Durling, and Daniel L. Porter) for plaintiff Hyundai Electronics.

Kaye, Scholer, Fierman, Hays & Handler LLP (Raymond Paretzky) for plaintiff LG Semicon.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Patricia McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Kenneth S. Kessler); Patrick V. Gallagher, Jr., of counsel, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant United States.

Hale & Dorr (Michael D. Esch and Gilbert D. Kaplan) for defendant-intervenor Micron Technology, Inc.

**OPINION**

**GOLDBERG, Senior Judge:**  In this consolidated action, Hyundai

Electronics Industries Co., Ltd. and Hyundai Electronics America,

Inc. (collectively "Hyundai") challenges the final results of the

Department of Commerce's ("Commerce") fifth administrative review

regarding Dynamic Random Access Memory semiconductors of one

megabit or above ("DRAMs") from the Republic of Korea covering

the period of May 1, 1997 through April 30, 1998.   See Dynamic

Random Access Memory Semiconductors of One Megabit Or Above from

the Republic of Korea, 64 Fed. Reg. 69694 (Dec. 14, 1999) ("Final

Results").  At issue in this case are DRAMs produced by LG

Semicon Co., Ltd. ("LG Semicon")[1] and Hyundai.  For the reasons

that follow, the Court sustains in part and reverses and remands

in part the Final Results.  The Court has jurisdiction over this

matter pursuant to 28 U.S.C. § 1581(c).

**I.  BACKGROUND**

On May 10, 1993, Commerce published the antidumping duty

order on DRAMs from the Republic of Korea.  See Dynamic Random

---

[1] After the fifth adminstrative review was completed,
respondent Hyundai acquired respondents LG Semicon Co., Ltd. and
LG Semicon America, Inc. (collectively "LG Semicon").  Hyundai
challenges the Final Results as they pertain to LG Semicon and
Hyundai.  In this opinion, Hyundai-as-successor-in-interest-to-LG
Semicon is referred to as LG Semicon.

Access Semiconductors of One Megabit or Above from the Republic of Korea, 58 Fed. Reg. 27520 (May 10, 1993).  In response to a request by Defendant-Intervenor Micron Technology, Inc. ("Micron"), a domestic producer of DRAMs, Commerce initiated the fifth administrative review of the antidumping order on June 29, 1998.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part, 65 Fed. Reg. 35188 (June 29, 1998).

On June 8, 1999, Commerce published the preliminary results for the fifth administrative review.  See Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea: Preliminary Results of the Antidumping Administrative Review and Notice of Intent Not to Revoke Order, 64 Fed. Reg. 30481 (June 8, 1999) ("Preliminary Results").  Commerce applied partial adverse facts available in calculating the dumping margin for LG Semicon because it found that it had reported as third-country sales "a substantial number of U.S. sales that it knew or should have known were U.S. sales," and concluded that LG Semicon "failed to cooperate to the best of its ability."  Id. at 30482.

Commerce published the Final Results on December 14, 1999. Commerce determined that in selling DRAMs to customers in Germany and Mexico, LG Semicon knew or should have known that the ultimate destination of the products was the United States.  See

Final Results, 64 Fed. Reg. at 69717.  Further, Commerce concluded that LG Semicon failed to cooperate to the best of its ability by failing to report the sales to customers in Germany and Mexico as U.S. sales and also because of the inadequacy of the information supplied.  See id. at 69696.  As a result, Commerce based the final dumping margin on total adverse facts available.  See id.  Using total adverse facts available for LG Semicon, Commerce applied the highest rate calculated in the Final Results, which was the margin for Hyundai.  See id.

In addition, Commerce recalculated the research and development ("R&D") expenses for LG Semicon and Hyundai.  See id. Commerce recalculated these expenses because of alleged distortions due to changes in LG Semicon and Hyundai's accounting methodologies.  See id. at 69699.  Previously, the companies had expensed R&D costs in the year incurred, but in the period of the fifth review they switched to capitalizing the costs.  See id. Commerce achieved its recalculation by allocating R&D expenses of all semiconductors produced by LG Semicon and Hyundai over the total semiconductor cost of goods sold.  See id. at 69702.

## II. STANDARD OF REVIEW

The Court must sustain the Final Results unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  To

determine whether Commerce's construction of the statutes is in accordance with law, the Court looks to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). It is only if the Court concludes that "Congress either had no intent on the matter, or that Congress's purpose and intent regarding the matter is ultimately unclear," that the Court will defer to Commerce's construction under Chevron. Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998). In addition, "[s]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron." Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (interpreting United States v. Mead, 533 U.S. 218 (2001)). Accordingly, the Court will not substitute "its own construction of a statutory provision for a reasonable interpretation made by [Commerce]." IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992).

## III. <u>DISCUSSION</u>

**A.   Commerce's Treatment of LG Semicon DRAMs Sold Through Germany**

LG Semicon challenges the treatment of sales to a customer in Germany that Commerce determined entered the United States.

On September 14, 1999, three weeks before the scheduled final determination, Commerce placed a memorandum on the record

regarding information about sales made by LG Semicon to [

] ("the customer").  See Brief of Plaintiffs Hyundai

Electronics Indus. Co., Ltd. and Hyundai Electronics America,

Inc. in Support of Plaintiffs' Motion for Judgment Upon the

Agency Record ("Pl. LG Semicon's Br.") at 6; Appendix to Pl. LG

Semicon's Br. ("Pl. LG Semicon's Br. App."), C.R. 53 (Commerce

Memorandum Regarding LG Semicon's Sales to Germany).[2]  The memo

indicated that the German subsidiary of [                    ] ("the

customer's German subsidiary"), after purchasing DRAMs from LG

Semicon, shipped them to its manufacturing facility in Puerto

Rico ("the customer's Puerto Rican manufacturing facility").  It

noted that within days of LG Semicon's sale of DRAMs to the

customer's German subsidiary, a significant amount of DRAMs

entered the United States via the customer.  See Pl. LG Semicon's

Br. App., C.R. 53 at 2.

The memo contained information regarding Commerce's receipt

of an e-mail on January 4, 1999.  See Pl. LG Semicon's Br. App.,

C.R. 53, Ex. 1.  The e-mail, sent by a former employee of LG

Semicon, stated that LG Semicon was "knowingly and willfully"

dumping DRAMs into the United States by shipping DRAMs to the

customer's German subsidiary, which would then ship the DRAMs to

the customer's Puerto Rican manufacturing facility.  See id.  The

_____

[2] Citations to the administrative record include references to proprietary documents ("C.R.") and public documents ("P.R.").

e-mail also alleged that LG Semicon sold DRAMs to Germany in order to evade U.S. dumping duties and that LG Semicon's senior management both knew and approved of these sales.  See id.

The memo also disclosed for the first time information regarding Commerce's meeting with Mark Vecchiarelli, another former employee of LG Semicon.  See Pl. LG Semicon's Br. App., C.R. 53, Ex. 4; C.R. 63 (Commerce Memorandum Explaining and Attaching Draft and Final Versions of Exhibit 4 to Commerce's 09/13/1999 Memorandum).  In this meeting, Vecchiarelli informed Commerce that LG Semicon sold DRAMs to the customer's German subsidiary with the knowledge that the ultimate destination for the DRAMs was the customer's Puerto Rican manufacturing facility. See Pl. LG Semicon's Br. App., C.R. 53 at 2.

    **1.    Commerce's Determination that LG Semicon Knew or Should Have Known that DRAMs It Sold Were Destined for the United States Is Supported by Substantial Evidence.**

Commerce applies a "knowledge test" to determine whether a foreign producer knew or should have known, at the time of sale, that subject merchandise was destined for the United States.  See Wonderful Chemical Indus., Ltd. v. United States, 27 CIT __, __, 259 F. Supp. 2d 1273, 1279 (2003); LG Semicon Co., Ltd. v. United States, 23 CIT 1074, 1077 (1999).  Commerce's test is consistent with Congressional intent, as demonstrated by the Statement of Administrative Action accompanying the Trade Agreements Act of 1979, which provides: "if the producer knew or had reason to know

the goods were for sale to an unrelated U.S. buyer . . . the producer's sales prices will be used as 'purchase price' to be compared with that producer's foreign market value." H.R. Doc. No. 96-153; see also LG Semicon, 23 CIT at 1077. The knowledge test does not require Commerce to prove that the producer had actual knowledge, as such a requirement would "eviscerate the acknowledged standard." Allegheny Ludlum Corp. v. United States, 24 CIT 1424, 1434-35, 215 F. Supp. 2d 1322, 1332 (2000); see also Wonderful Chemical, 27 CIT at __, 259 F. Supp. 2d at 1279.[3]

LG Semicon claims that Commerce's decision was based solely on the statement made by Vecchiarelli. See Pl. LG Semicon's Br. at 22. LG Semicon contends that Vecchiarelli's statement is not truthful and accurate. See id. at 23. LG Semicon argues that

---

[3] LG Semicon's selective use of passages from certain decisions misleadingly suggests both directly and indirectly that actual knowledge is the proper standard. See, e.g., NSK Ltd. v. United States, 21 CIT 617, 645-46, 969 F. Supp. 34, 61 (1997), aff'd in part, 190 F.3d 1321, 1333-35 (Fed. Cir. 1999); INA Walzager Schaeffler KG v. United States, 21 CIT 110, 123, 957 F. Supp. 251, 263 (1997), aff'd, 180 F.3d 1370 (Fed. Cir. 1999); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic Of China; Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 61276 (Nov. 17, 1997) ("Tapered Roller Bearings"). For example, LG Semicon quotes language from Tapered Roller Bearings, in which Commerce states "[l]acking evidence of actual knowledge that particular sales were destined for the United States, we cannot assume such knowledge, regardless of general knowledge that some merchandise was intended for exportation to the United States. Pl. LG Semicon's Br. at 13 (quoting Tapered Roller Bearings, 62 Fed. Reg. at 61291 (emphasis added)). Here, LG Semicon underscores the words "actual knowledge." This Court has rejected this understanding of the knowledge test. See LG Semicon, 23 CIT at 1077-79.

even assuming that Vecchiarelli's statement was truthful and accurate, his statement still fails to establish LG Semicon's knowledge that particular sales to the customer's German subsidiary were destined for the United States. See id. LG Semicon suggests that Vecchiarelli's statement exaggerated the scope of his role in the contested transactions. See id. Vecchiarelli maintained that he "was responsible for servicing all of the semiconductor requirements of [          ] upon a worldwide basis," and "was responsible for the pricing and supply decisions for all sales worldwide to [          ]." Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Def.'s Mem. in Opp'n") at 11; Appendix to Def.'s Mem. in Opp'n ("Def.'s Mem. in Opp'n App."), C.R. 54 (Letter from DOC re declaration attached to unreported sales memo) at ¶ 2. LG Semicon argues that "he was not personally involved in filling individual orders placed by [   ] overseas locations with LG Semicon's overseas subsidiaries." See Pl. LG Semicon's Br. at 23. LG Semicon derives this conclusion from statements made by Vecchiarelli's successor, Mr. Pizarev, describing the scope of his authority as LG Semicon's Global Accounts Manager for the customer.[4]

---

[4] Pizarev stated that "I did not have authority to deal with [          ] abroad. These [    ] were dealt with by LG's regional people. Thus, for example, LG staff in Germany dealt with [    ] German [    ]. . . for these sales, [          ] in Germany would have talked directly to LG Germany to place orders

The Court finds that Commerce had substantial evidence indicating that it was within the ambit of Vecchiarelli's employment to know that the DRAMs sold by LG Semicon's German affiliate ("LG-Germany") to the customer's German subsidiary were destined for the customer's Puerto Rican manufacturing facility. At the very least, Vecchiarelli was in a position to be aware of the transactions between LG Semicon and the customer. Vecchiarelli regularly briefed LG Semicon corporate officials about the status of the customer's account, including the pricing and supply arrangements that he arranged with the customer, thus suggesting that Vecchiarelli knew the price, volume, and destination for LG Semicon DRAMs at the time of their sale. See Def.'s Mem. in Opp'n App., C.R. 54 at 2, ¶ 3. Additionally, there was documentation submitted at verification that repeatedly listed Vecchiarelli as the World Wide Sales Manager and provided information regarding the product needs for the customer's Puerto Rican manufacturing facility. See Def.'s Mem. in Opp'n App., C.R. 51 (Verification Report of LG Semicon), Ex. 69 at 1, 4, 48. A statement made by Y.S. Yin, LG Semicon's General Manager for

for the products that it needed." See Pl. LG Semicon's Br. at 23-24; see Pl. LG Semicon's Br. App., C.R. 64 (LG Semicon's Submission of Factual Information Regarding LG Semicon's Sales to Germany) at ¶ 5. Pizarev also stated that Vecchiarelli never informed him about any arranged shipments from LG Semicon's German affiliate ("LG-Germany") to the customer's German subsidiary for further resale to the customer's Puerto Rican manufacturing facility. See Pl. LG Semicon's Br. at 24 n.17; Pl. LG Semicon's Br. App., C.R. 64 at ¶ 8.

Global Accounts, confirms Vecchiarelli's position and responsibilities as Global Accounts Manager for the customer. See Def.'s Mem. in Opp'n App., C.R. 51 at 6. Furthermore, even assuming that Vecchiarelli was not in a position to know the specific whereabouts of each DRAM sold, there is substantial evidence indicating that he had specific knowledge that the ultimate destination of the DRAMs sold by LG-Germany to the customer's German subsidiary was the customer's Puerto Rican manufacturing facility. Vecchiarelli expressly stated that he established a sales channel to ensure the customer's access to LG Semicon DRAMs "because LG's pricing structure included a floor price and I was not permitted to sell DRAMs to the United States through LGSA below this floor price." Def.'s Mem. in Opp'n App., C.R. 54 at 3-4, ¶ 5. Vecchiarelli also indicated that "[t]o [his] knowledge, [                  ] did not subcontract, anywhere in the world, the production of memory modules using the discrete DRAMs LG sold to [                  ]." See Def.'s Mem. in Opp'n App., C.R. 54 at 4, ¶ 6. Vecchiarelli asserted that he knew that any sale of discrete DRAMs to a division of the customer was intended for the customer's Puerto Rican manufacturing facility. See Def.'s Mem. in Opp'n App., C.R. 53 at 2.

LG Semicon maintains that the prices of DRAMs sold to the customer's German subsidiary were not lower than the prices of DRAMs sold to the customer's Puerto Rican manufacturing facility,

thus negating the necessity for the sales channel.  See Pl. LG Semcicon's Br. at 24.  Additionally, LG Semicon offers several statements made by the customer in support of its argument that Vecchiarelli had no way of knowing the ultimate destination of the DRAMs was the United States.  In these statements, the customer indicated that its [          ] did not just purchase DRAMs for the customer's Puerto Rican manufacturing facility but for its other manufacturing operations or their contract manufacturers all over Europe.  See Pl. LG Semicon's Br. App., C.R. 65 (Letter from LG Semicon's Customer to Commerce Regarding its Purchases of DRAMs from LG Semicon) at 2-3.  The customer also maintained that its Puerto Rican manufacturing facility was not its only entity that used discrete DRAMs.  See id. Furthermore, the customer stated that it did not inform its sources of the ultimate destination of their products and that Vecchiarelli would not know the ultimate destination of the DRAMs that its German subsidiary purchased.  See id.

The Court finds that LG Semicon's assertion that the sales price to the customer's German subsidiary was higher than the U.S. sales price is neither supported by the record nor material to Vecchiarelli's establishment of the sales channel.  Even assuming that the price was higher, it is irrelevant to the fact that Vecchiarelli established the sales channel to avoid reporting these sales as U.S. sales.  The information and

statements made by the customer fail to convince the Court that Vecchiarelli did not know that the DRAMs sold to the customer's German subsidiary were intended for the United States.  In light of Vecchiarelli's position and responsibilities, his detailed statements of an established sales channel, and the lack of specific evidence suggesting that the customer's Puerto Rican manufacturing facility was not the sole destination for discrete DRAMs, the Court finds that Vecchiarelli's testimony supports Commerce's determination that LG Semicon knew or should have known that its DRAMs were destined for the United States.

### 2.    Customs' Data Corroborate Vecchiarelli's Statement.

Commerce determined that data from the United States Customs Service ("Customs") that it placed upon the record corroborate Vecchiarelli's statement.  See Final Results, 64 Fed. Reg. at 69696.  Commerce claims that the Customs data support the existence of the sales channel that Vecchiarelli stated that he constructed.  See Def.'s Mem. in Opp'n at 15.

Commerce notes that after LG-Germany made sales to the customer's German subsidiary, a significant portion of the DRAMs arrived in the United States within days of the initial sale by LG-Germany.  See id.  Commerce claims that these entries frequently consisted of the identical quality and value of DRAMs reported on the sales invoices from LG-Germany to the customer's

German subsidiary.[5]  Commerce further claims that the data indicated that numerous other transactions, involving shipments of the exact quantity and value by LG-Germany to the customer's German subsidiary, arrived within days to the customer's Puerto Rican manufacturing facility via the customer's German subsidiary.  See Def.'s Mem. in Opp'n App., C.R. 61 (Revision to unreported sales data and excerpts from Customs unreported sales data) at 3b.  Additionally, Commerce notes that when it randomly selected several invoices, it found out that not only were the DRAMs manufactured by LG Semicon, but that these samples possessed the exact same configurations that Vecchiarelli described in his statement.  See Def.'s Mem. in Opp'n App., C.R. 61 at 3c;, C.R. 50 (DOC verification report re LG Semicon DRAMs sales).  Finally, Commerce asserts that the focus of the examination was not to prove that every DRAM sold by LG-Germany to the customer's German subsidiary entered the United States, but rather to independently test the accuracy of Vecchiarelli's statement.  See Def.'s Mem. in Opp'n at 16.

_____

[5] Commerce offers the following examples: (1) on May 6, 1997, LG-Germany sold [      ] DRAMs to the customer's German subsidiary for $[        ]; (2) on May 12, 1997, the customer entered [      ] DRAMs for $[         ]; (3) on June 18, 1997, LG-Germany sold [      ] DRAMs to the customer's German subsidiary for $[        ]; and (4) on June 19, 1997, the customer entered [      ] DRAMs for $[        ].  Def.'s Mem. in Opp'n App., C.R. 61 at Ex. 36, C.R. 78 (DOC unreported sales memorandum (Germany)) at 4.

The Court finds Commerce's reliance on this corroborating evidence reasonable.  The Customs data sufficiently corroborate Vecchiarelli's assertions, thereby supporting a finding that LG Semicon knew or should have known that the DRAMs sold to the customer's German subsidiary were destined for the United States.

Accordingly, the Court holds that Vechiarelli's statement and corroborating Customs data constitute substantial evidence to support Commerce's determination that LG Semicon knew or should have known that its DRAMs were destined for the United States.

**B.    Commerce Did Not Violate LG Semicon's Right to a Fair and Honest Proceeding.**

LG Semicon alleges that Commerce's administrative review was not a "fair and honest" proceeding.  See Plaintiffs' Memorandum of Points and Authorities in Support of Count Nine ("Pls. Mem. in Supp. of Count Nine") at 5.  LG Semicon argues that Commerce failed to remain impartial by "(1) not providing the parties adequate opportunity to rebut harmful allegations, actions which violated the statutory provision governing ex parte communications; and (2) failing to consider exculpatory evidence."  Id.

"[A]n importer may be entitled to procedural due process regarding the resolution of disputed facts involved in a case of foreign commerce when the importer faces a deprivation of 'life, liberty, or property' by the Federal Government."  NEC Corp. v.

United States, 151 F.3d 1361, 1370 (Fed. Cir. 1998). The parties

involved in an antidumping proceeding are entitled to a fair and

honest process. See id. Furthermore, "the right to an impartial

decision maker is unquestionably an aspect of procedural due

process." Id. The notion of transparency is fundamental to an

antidumping proceeding, including access to information on which

decisions are based. See S. Rep. No. 96-249 at 41, 98; Statement

of Administrative Action accompanying the Uruguay Round

Agreements Act, H.R. Doc. 103-316 (1994).

**1.** **Commerce Did Not Violate the Ex Parte Meetings Statute**.

LG Semicon alleges that Commerce failed to timely disclose

ex parte meetings, thereby denying them a meaningful opportunity

to respond to the allegations made during these respective

meetings. See Pls. Mem. in Supp. of Count Nine at 5.

19 U.S.C. § 1677f(a)(3) governs ex parte meetings, providing

that:

> (3) The administering authority and the Commission
> shall maintain a record of any ex parte meeting between
> --
> (A)  interested parties or other persons providing
>    factual information in connection with a proceeding,
>    and
> (B)  the person charged with making the determination,
>    or any person charged with making a final
>    recommendation to that person, in connection with
>    that proceeding, if information relating to that
>    proceeding was presented or discussed at such
>    meeting.  The record of such an ex parte meeting
>    shall include the identity of the persons present at
>    the meeting, the date, time and place of the
>    meeting, and a summary of the matters discussed or

submitted.  The record of the ex parte meeting shall
be included in the record of the proceeding.

19 U.S.C. § 1677f(a)(3).

Section 1677f(a)(3) requires that memoranda of ex parte
meetings submitted on the record must include a summary of the
discussion and the information submitted.  See Nippon Steel Corp.
v. United States, 24 CIT 1158, 1164, 118 F. Supp. 2d 1366, 1373
(2000).  A failure to timely notify a party of ex parte meetings
deprives the party a full opportunity to respond, thus violating
procedural due process.  Id. at 1374.

> *a.    Commerce's Receipt of an E-Mail Message from a Former
>         LG Semicon Employee Does Not Constitute an Ex Parte
>         Meeting.*

LG Semicon argues that the January 4, 1999 e-mail message
from a former employee of LG Semicon falls within the statutory
definition of an ex parte meeting.  Pls. Mem. in Supp. of Count
Nine at 7; Plaintiffs' Reply Brief Concerning Count Nine of the
Amended Complaint ("Pls. Reply Br. Concerning Count Nine") at 5-
7.  LG Semicon draws an analogy between e-mail messages and phone
calls, the latter of which have been recognized as an ex parte
meeting.  See F.LLI De Cecco Di Fillipo Fara San Martino S.P.A.
v. United States, 21 CIT 1124, 980 F. Supp. 485 (1997); Pls.
Reply Br. Concerning Count Nine at 7.  In light of the plain
language of the statute, the Court concludes that the e-mail does
not constitute an ex parte meeting.  Section 1677f(a)(3)

explicitly refers to <u>ex parte</u> <u>meetings</u> (emphasis added).  Unlike
a telephone call, which LG Semicon claims is comparable to an e-
mail, the unsolicited e-mail message in this case was a one-way
communication.  This negates any facially reasonable notion that
a meeting occurred.  Accordingly, Commerce's handling of the e-
mail did not violate LG Semicon's procedural due process.

### b.    Commerce's Placement of its Meeting with Vecchiarelli on the Record Within Eighteen Days Does Not Constitute a Violation of LG Semicon's Procedural Due Process.

Commerce interviewed Vecchiarelli on August 27, 1999.
Commerce placed this information on the record on September 14,
1999, 18 days later.  <u>See</u> Pls. Mem. in Supp. of Count Nine at 8;
Pl. LG Semicon's Br. App., C.R. 53, Ex. 4.  LG Semicon claims
that by waiting 18 days, Commerce sought to "maximize the element
of surprise."  <u>See</u> Pls. Reply Br. Concerning Count Nine at 9.  LG
Semicon argues that this was contrary to <u>Nippon Steel</u>, which held
that memoranda must be "drafted expeditiously in all cases,
reviewed by a person in attendance at the meeting and placed in
the record as soon as possible."  24 CIT at 1166, 118 F. Supp. 2d
at 1374.  In sum, according to LG Semicon, Commerce "did not
provide an adequate opportunity for Plaintiffs to inspect the <u>ex</u>
<u>parte</u> communication, seek clarification and/or provide rebutting
information."  <u>See</u> Pls. Mem. in Supp. of Count Nine at 8.

The Court finds that Commerce provided LG Semicon with
adequate opportunity to respond.  Section 1677f(a)(3) does not

provide a specific time frame in which Commerce must put information on the record.  Commerce is only required to have timely memoranda drafted and filed in order for parties to view them at a useful point during the proceeding.  See Nippon Steel, 24 CIT at 1165, 118 F. Supp. 2d at 1373.  The instant case is distinguishable from Nippon Steel, where Commerce was found to have violated § 1677f(a)(3) when it placed one ex parte memorandum on the record on or about the day of the final determination.  See Nippon Steel, 24 CIT at 1163-66, 118 F. Supp. 2d at 1372-74.  Here, the Court finds that the disclosure of the ex parte meeting within 18 days of the actual meeting was timely, as long as it provided LG Semicon with a meaningful opportunity to respond.

In regards to LG Semicon's ability to respond, the Court finds that the three weeks afforded to LG Semicon to submit factual information and comments on the contested issues was sufficient.  Commerce afforded LG Semicon several opportunities to comment.  After the initial disclosure of Vecchiarelli's allegations, Commerce gave LG Semicon until October 4, 1999 to submit factual information, a total of 21 days.  See Pl. LG Semicon's Br. App., P.R. 157 (LG Semicon's Request for an Extension of Time to Respond to Commerce's 09/13/1999 Memorandum).  After LG Semicon requested an extension, Commerce permitted LG Semicon to submit this information on October 7,

1999.  On October 7, 1999, LG Semicon submitted factual information to rebut Vecchiarelli's allegations.  See Pl. LG Semicon's Br. App., C.R. 64 (LG Semicon's Submission of Factual Information Regarding LG Semicon's Sales to Germany).  Furthermore, LG Semicon filed its case brief on October 21, 1999, which included challenges to the e-mail and Vecchiarelli's statements.  See Pl. LG Semicon's Br. App., C.R. 67 at 87-115.  LG Semicon also raised these same contentions during a public hearing on November 4, 1999.  See Pl. LG Semicon's Br. App., P.R. 178 (Public Hearing Transcript) at 6, 25-31, 131-32.  In sum, Commerce gave LG Semicon over three weeks to submit its initial comments and information.  This included two separate extensions that in total extended Commerce's initial deadline by two weeks.  Accordingly, the Court concludes that Commerce provided LG Semicon with a meaningful opportunity to respond.

## 2.    Commerce Did Not Ignore Exculpatory Evidence.

LG Semicon argues that Commerce did not act as an impartial decision maker by consciously ignoring exculpatory evidence.  LG Semicon maintains that Commerce's refusal to consider and confirm this evidence was evident throughout the investigation.  See Pls. Mem. in Supp. of Count Nine at 9.

First, LG Semicon points to Commerce's failure to question LG Semicon senior officials about the diversion of LG Semicon's German sales to the United States.  See id.  LG Semicon suggests

that this questioning was essential because both the January 4, 1999 e-mail and Vecchiarelli's statement alleged that senior management knew of the diverted sales, and actual or constructive knowledge is a necessary requirement for Commerce's determination. See id. at 9-10. LG Semicon notes that even though Commerce failed to specifically question these officials during the April 1999 verification period, Commerce continued to make various requests for information and documents motivated by the allegations contained within the e-mail. See id. at 10. Furthermore, LG Semicon argues that Commerce never directly asked for information regarding LG Semicon's German sales. See id. It claims that it was Commerce's responsibility to disclose the subject of the investigation so that LG Semicon could provide the appropriate information. Id. LG Semicon argues that had it known about the e-mail, verification would have been the proper time for it to answer questions and present exculpatory evidence. See id.

Second, LG Semicon notes that Commerce failed to take the opportunity to view documents and evidence at LG-Germany, the site that LG Semicon felt had the most relevant information. See id. LG Semicon asserts that because the alleged diversion started in Germany, certainly LG-Germany contained useful information and documents. Id. at 11.

Third, LG Semicon takes issue with Commerce's refusal to speak with the customer regarding the alleged sales channel. <u>See</u> <u>id.</u> Specifically, LG Semicon points out that a letter sent by the customer to Commerce contained several statements that directly contradicted Vecchiarelli's statement. LG Semicon argues that Commerce's failure to respond to an offer of assistance by the customer and its disregard for the contents of the customer's letter demonstrate Commerce's lack of impartiality. <u>See</u> <u>id.</u> at 11-12.

The Court finds that Commerce did not fail to remain impartial in its proceedings by refusing to consider exculpatory evidence. Commerce is afforded broad discretion in the manner in which it conducts antidumping proceedings. <u>See</u> <u>Torrington Co. v.</u> <u>United States</u>, 25 CIT __, __, 146 F. Supp. 2d 845, 897 (2001) ("Commerce enjoys wide latitude in its verification procedures."); <u>Union Camp Corp. v. United States</u>, 23 CIT 264, 283, 53 F. Supp. 2d 1310, 1328 (1999) (Commerce, in weighing the competing interests of efficient investigations and accurate fact-finding, must make choices of administrative practice and procedure). Here, Commerce did not clearly act outside the bounds of its discretion in conducting verification. <u>See</u> <u>Hontex</u> <u>Enter., Inc. v. United States</u>, 27 CIT __, __, 248 F. Supp. 2d 1323, 1335 (2003) (finding that Commerce's decision in an antidumping proceeding not to question the owners of the company

about their knowledge of an employee's actions was not unfair, especially since the plaintiffs had an opportunity to comment on the matter at a later point).  Notwithstanding the issue of whether it was within Commerce's discretion not to question LG Semicon senior officials, it is clear that Commerce did in fact question these officials.  LG Semicon officials, including Yin, gave statements to Commerce indicating their belief that "all sales made to the United States by LG Semicon are processed through LG Semicon's U.S. affiliate, LGSA."  Def.'s Mem. in Opp'n App., C.R. 50 (DOC verification report re LG Semicon DRAMs sales) at 6.  These assertions were considered by Commerce against Vechiarelli's assertions to the contrary.  See Defendant's Supplemental Memorandum In Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record at 16.

Commerce also properly exercised its discretion in its decision not to investigate LG-Germany.  As a result of LG Semicon's insistence that its U.S. affiliate, LGSA, was the only entity responsible for U.S. sales, it was reasonable for Commerce to believe that it had all the relevant information.  Likewise, an investigation of the German facility was not necessary because Commerce already had Vecchiarelli's statement and LG Semicon's sales data as evidence.  LG Semicon had an adequate opportunity to submit relevant information regarding LG-Germany but failed to avail itself of this opportunity.

Finally, Commerce acted within the bounds of its discretion when it chose not to pursue further contact with the customer involved in the present matter.  Commerce afforded the customer the opportunity to submit information and comments, and the customer availed itself of this opportunity.  Thereafter, Commerce reasonably decided that it was not necessary to discuss anything further.  As there is a presumption that Commerce has considered all evidence on the record, LG Semicon has failed to provide any evidence that overcomes this presumption.  See Fujitsu Ltd. v. United States, 23 CIT 46, 50 n.5, 36 F. Supp. 2d 394, 398 n.5 (1999).

Accordingly, the Court holds that Commerce did not fail to disclose ex parte meetings nor fail to consider exculpatory evidence.

**C.    Commerce Erred in Applying Total Adverse Facts Available to LG Semicon's Entire U.S. Sales Database.**

LG Semicon challenges Commerce's application of total adverse facts available to LG Semicon's entire U.S. sales database.  Commerce used total adverse facts available because of undisclosed sales to [                    ] German subsidiary, see supra III(1), in addition to undisclosed sales to [

                    ] ("the unaffiliated Mexican customer") that were ultimately destined for the United States.

Commerce is required to consider information submitted by a party only if:

> (1) the information is submitted by the deadline established  for its submission, (2) the information can be verified, (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination, (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements . . ., and (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).


19 U.S.C. § 1677e(a) provides that Commerce is required to use facts otherwise available if:

> (2) an interested party or any other person–
>         (A) withholds information that has been requested by the administrating authority or the Commission under this subtitle,
>         (B) fails to provide such information by the deadlines for the submission of the information or in the form and manner requested . . .
>         (C) significantly impedes a proceeding under this subtitle, or
>         (D) provides such information but the information cannot be verified . . . .

19 U.S.C. § 1677e(a).

Furthermore, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce has the discretion to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  If Commerce concludes that a party's response to a request for information did not comply with

its request, then Commerce must notify the party of this deficiency and provide them with an opportunity to remedy or explain the deficiency.  19 U.S.C. § 1677m(d).

Commerce maintains that use of facts available was proper because LG Semicon failed to provide information or complete responses to Commerce's requests as required by § 1677e(a) and that an adverse inference was justified because LG Semicon failed to act to the best of its ability as required by § 1677e(b).  See Def.'s Mem. in Opp'n at 22.  Even though Commerce provided LG Semicon with several opportunities to remedy or explain deficiencies in regards to its U.S. sales as required under § 1677m(d), Commerce asserts that LG Semicon chose to "treat these sales as third country sales in spite of the record evidence to the contrary."  Id. at 24.  Commerce maintains that the burden is on the respondent to submit accurate information, and even if Commerce has information on the record that can correct the error, a respondent cannot expect Commerce to correct the information or guarantee its accuracy.  See id.; see also Mannesmannrohren-Werke AG v. United States, 24 CIT 1082, 1097, 120 F. Supp. 2d 1075, 1087 (2000) ("Mannesmannrohren II") ([I]t is [the respondent's] burden to respond to Commerce's questionnaires and to develop the record.").  Furthermore, Commerce asserts that the information submitted by LG Semicon did not meet the statutory requirements set forth in § 1677m(e).

Commerce's justification for using adverse facts for the Mexican sales revolves around LG Semicon's decision to claim that these sales were third country sales. LG Semicon submitted to Commerce computer sales listings for sales to the unaffiliated Mexican customer. See Pl. LG Semicon's Br. App., C.R. 15 (LG Semicon's Second Supplemental Questionnaire Response) at App. SS-8. Commerce claims that it did not calculate them as U.S. sales because LG Semicon insisted that these sales were not U.S. sales, in spite of evidence on the record indicating that LG Semicon knew or should have known that the destination of these sales was the United States. See Def.'s Mem. in Opp'n at 19, 25-28. According to Commerce, LG Semicon's submission of the Mexican sales was untimely because Commerce chose not to verify the information due to LG Semicon reporting the sales as third country sales. See id. at 25. Commerce notes that "LG Semicon submitted U.S. expense information only in the alternative, and never admitted during the administrative proceeding that the sales . . . were sales ultimately destined for the United States." Id. Additionally, Commerce contends that the "U.S. sales information was so incomplete that it could not be used without undue difficulties and the use of facts available." Id. at 27. Finally, Commerce points out that the "unreported" Mexican sales, when combined with the "unreported" German sales, represented approximately [  ] percent of LG Semicon's U.S.

sales. See id. at 25. Because such a substantial portion of LG Semicon's U.S. sales were unreported and unverified, Commerce argues that LG Semicon's response was substantially incomplete and an unreliable basis for determining its dumping margin. See id. at 25-26. Commerce asserts that because the sales issue in the fifth administrative review was identical to the fourth administrative review, in which Commerce determined that LG Semicon knew or should have known that these sales were diverted to the United States, LG Semicon's insistence that these sales were third country sales rendered the information untimely, unusable, and unverifiable. See id. at 25-28.

With respect to the sales to the unaffiliated Mexican customer, the Court finds that Commerce not only failed to meet the requisite finding for adverse facts available, but also failed to demonstrate the need to apply facts otherwise available. The application of adverse facts available requires a finding that "an interested party has failed to cooperate by not acting to the best of its ability." Mannesmannrohren-Werke v. United States, 23 CIT 826, 838, 77 F. Supp. 2d 1302, 1313 (1999) ("Mannesmannrohren I"). It is "not sufficient for Commerce to simply assert this legal standard as its conclusion or repeat its finding concerning the need for facts available." Id.

Commerce erred in concluding that LG Semicon's insistence that the sales to the unaffiliated Mexican customer were third

country sales rendered the data untimely, unusable, and unverifiable. At the beginning of the fifth administrative review, LG Semicon notified Commerce that it planned to treat these sales as third country sales, although Commerce had determined otherwise in the fourth review. This Court's disposition of the fourth administrative review in LG Semicon v. United States, 23 CIT 1074 (1999) was issued on December 30, 1999, 16 days after the Final Results were issued on December 14, 1999. It is indisputable that LG Semicon timely submitted computer sales listings and subsequently amended its submission in response to further information placed by Commerce upon the record. See Def.'s Mem. in Opp'n at 19. Although Commerce is not required to verify each piece of information, Commerce may not arbitrarily disregard timely-submitted information. See AL Tech Specialty Steel Corp. v. United States, 20 CIT 1344, 1353-54, 947 F. Supp. 510, 519 (1996) ("Commerce cannot apply . . . time limits arbitrarily or capriciously by refusing to accept information submitted before the applicable deadline."). Because the U.S. sales were subject to verification, it was unreasonable for Commerce not to consider the sales to the unaffiliated Mexican customer at verification solely because the information would have been irrelevant if these sales were deemed to be third country sales. Furthermore, even if Commerce found LG Semicon's response and explanations to its questionnaires unsatisfactory,

it was still required to use LG Semicon's information if §

1677m(e)'s requirements were met.  Mannesmannrohren I, 23 CIT at

838, 77 F. Supp. 2d at 1313; Borden, Inc. v. United States, 22

CIT 233, 262-63, 4 F. Supp. 2d 1221, 1245-46 (1998).

With respect to the German sales, the Court holds that

Commerce's use of adverse facts available is supported by

substantial evidence.  As discussed above, Commerce established

that LG Semicon knew or should have known that DRAMs sold to the

customer's German subsidiary were destined for the U.S. market.

As LG Semicon did not submit these sales to Commerce as U.S.

sales, the Court finds that Commerce did not err in concluding

that LG Semicon did not act to the best of its ability to comply

with its requests for information regarding the German sales,

thus justifying use of adverse facts available under § 1677e(b).

Since the Court has determined that Commerce erred in using

adverse facts available for the sales to the unaffiliated Mexican

customer, use of total adverse facts available is not warranted.

Accordingly, the Court remands to Commerce on this issue with

instructions to recalculate LG Semicon's dumping margin using the

sales data submitted by LG Semicon for the Mexican sales and

using adverse facts available only for LG Semicon's sales to the

customer's German subsidiary.

**D.    Commerce's Treatment of LG Semicon's and Hyundai's Research
        and Development Costs**

LG Semicon and Hyundai challenge two aspects of Commerce's treatment of their research and development costs used in constructing the cost of production. The two issues are (1) whether Commerce was reasonable in incorporating Plaintiffs' R&D costs for all semiconductor production based on cross-fertilization; and (2) whether Commerce properly rejected Plaintiffs' accounting methodology for R&D costs. Hyundai makes three additional R&D claims separately from LG Semicon. The Court will now address each of these R&D-related claims.

1.    **Commerce's Decision Not to Calculate Costs On a Product-Specific Basis Is Not Supported By Substantial Evidence.**

In the Final Results, Commerce's calculation of R&D costs incorporated R&D costs of all semiconductor products, instead of costs applicable only to subject merchandise. 64 Fed. Reg. at 69702. 19 U.S.C. § 1677b(f)(1)(A) provides that:

> Costs shall be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs.

LG Semicon and Hyundai argue that Commerce erred by including R&D costs for all semiconductor products in calculating their respective costs of production. They contend that Commerce

improperly deviated from its practice of calculating costs on the most product-specific basis available based on the level of detail in a company's accounting records.  LG Semicon argues that because it maintained "accurate and fully verified records" that listed product expenses according to particular products, including DRAMs, Commerce should only include R&D costs associated with producing DRAMs in LG Semicon's cost of production.  See Pl. LG Semicon's Br. at 41.  Hyundai argues that since its accounting records distinguish between memory and non-memory products, its cost of production should only include R&D costs linked to production of its memory products.  See Memorandum of Points and Authorities in Support of Motion by Plaintiffs Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America for Judgment on the Agency Record  ("Pl. Hyundai's Br.") at 33.

Commerce and Micron maintain that there are intrinsic benefits that occur between R&D expenditures on non-subject merchandise and production of subject merchandise, and therefore R&D costs for non-subject merchandise should be included in the cost of production analyses.  Commerce contends that R&D cross-fertilization occurs in the semiconductor industry based on the findings of its expert, Dr. Murzy Jhabvala, Chief Engineer, Instrument Technology Center, National Aeronautics and Space Administration - Goddard Space Flight Center.

In the Final Results, Commerce determined that "DRAM-specific R&D account entries do not by themselves reflect all costs associated with the production and sale of subject merchandise." 64 Fed. Reg. at 69702. According to Commerce, it followed a "long-standing practice, where costs benefit more than one product, to allocate these costs to all the products which they benefit." Id. This Court has held that it is appropriate to include R&D expenditures for non-subject merchandise in calculating the cost of producing the subject merchandise if substantial evidence supports such a determination. Micron Tech., Inc. v. United States, 19 CIT 829, 832, 893 F. Supp. 21, 27 (1995).

LG Semicon offers verified records that show product-specific R&D costs at each of its laboratories demonstrating non-DRAM R&D efforts do not benefit the production of DRAMs. See Pl. LG Semicon's Br. App., C.R. 49 (Commerce's Cost Verification Report for LG Semicon), Ex. 8. Similarly, Hyundai offers evidence in the form of questionnaire responses showing that its R&D costs are separated into memory and non-memory categories. See Appendix to Pl. Hyundai's Br. ("Pl. Hyundai's Br. App.") at 18. Plaintiffs also submit the opinions of three experts that explain how cross-fertilization of R&D expenditures within the semiconductor industry is limited or non-existent. See Appendix to Pl. LG Semicon's Reply Br. ("Pl. LG Semicon's Reply Br.

App."), P.R. 56.  Plaintiffs have submitted substantial evidence to demonstrate why R&D expenses for non-subject merchandise should not be applied to subject merchandise.  See Micron, 19 CIT at 832, 893 F. Supp. at 28 (describing substantial evidence as "ample citation to verified record evidence that the subject merchandise did not derive an intrinsic benefit from R&D related to other semiconductor products").

In arguing that cross-fertilization occurs between DRAMs and non-DRAM merchandise with respect to R&D costs in this case, Commerce relies on the expert opinion of Jhabvala.  According to Jhabvala, "SRAMs represent along with DRAMs the culmination of semiconductor research and development.  Both families of devices have benefitted from the advances in photolithographic techniques . . . . Clearly, three distinct areas of semiconductor technology are converging to benefit the SRAM device performance."  See Final Results, 64 Fed. Reg. at 69701 (citing September 8, 1997 Memorandum from Murzy Jhabvala to U.S. Department of Commerce, Sept. 8, 1997).

Jhabvala's opinion is based upon his research for a prior antidumping investigation regarding SRAMs.  See id.  However, DRAMs, and not SRAMs, are the focus of this review.  Id. at 69694.  Moreover, the plaintiffs in the prior SRAM investigation do not overlap with Plaintiffs in this investigation.  In fact, Jhabvala had no direct contact or experience with Plaintiffs'

practices during this review.  See Def.'s Mem. in Opp'n at 33.

Therefore, because the evidence submitted by Commerce concerns

different products and different parties to that of the current

review, the Court finds that Commerce has not offered substantial

evidence for the Court to sustain Commerce's determination on the

theory of cross-fertilization.

Accordingly, the Court remands this issue to Commerce to

provide additional information specifically pointing to the

effect of non-subject merchandise R&D on the R&D for the subject

merchandise, or alternatively, recalculating R&D costs on the

most product-specific basis possible for both LG Semicon and

Hyundai.

2.    **Commerce's Rejection of Plaintiffs' Method of
      Accounting for R&D Expenses is Not Supported by
      Substantial Evidence**.

Commerce included all R&D costs incurred during the fifth

administrative review in determining the R&D expenses for LG

Semicon and Hyundai.  Final Results, 64 Fed. Reg. at 69700.

Plaintiffs disagree with Commerce's rejection of their accounting

methodology in calculating R&D expenses for the cost of

production.

Specifically, LG Semicon and Hyundai maintain that

amortization of R&D costs over five years and the deferral of

certain R&D costs until relevant revenue from those R&D

expenditures is first realized are reasonable accounting

practices, and in accordance with the generally accepted accounting principles ("GAAP") of the exporting country, South Korea. Final Results, 64 Fed. Reg. at 69699. Under 19 U.S.C. § 1677b(f)(1)(A), the cost of production calculation should follow GAAP of the exporting country.

While Commerce does not disagree that the accounting methodology is in accordance with Korean GAAP, Commerce finds that the cost of production calculations for the companies have been distorted for this period of review because of the switch to the practice of amortization and deferral from the practice of expensing all R&D costs incurred during a period. Final Results, 64 Fed. Reg. at 69699. Although this Court has previously recognized amortization of R&D costs as an "established practice," Commerce may also enjoy judicial deference when abandoning an established practice if there is reasoned analysis behind Commerce's decision. Micron, 19 CIT at 833, 893 F. Supp. at 28.

Here, Commerce argues that this is not the first time that LG Semicon and Hyundai have changed accounting methodologies.[6]

----

[6] In 1991, both LG Semicon and Hyundai amortized R&D costs. Preliminary Results, 64 Fed. Reg. at 30485. LG Semicon switched to expensing full R&D costs in the year incurred in its 1993 financial statements. Id. Hyundai also switched to expensing R&D costs in the year incurred sometime between 1991 and 1996. Id. In 1997, LG Semicon and Hyundai changed again to amortizing R&D costs. Id. In addition, Hyundai began deferring costs on long-term R&D projects in 1996, and LG Semicon followed suit in 1997. Id.

According to Commerce, Plaintiffs' practice of "continually changing" methodologies produces "aberrationally high amounts of R&D expense in some years, and aberrationally low amounts of R&D expense in other years, that do not reasonably reflect [production] costs."  Final Results, 64 Fed. Reg. at 69699. However, Plaintiffs' previous changes in accounting methodology are not relevant in this case as the Court is concerned with the actions of the parties with respect to their R&D costs only for this period of review.  Moreover, Commerce rules out any implication of deliberate manipulation to artificially lower costs by Plaintiffs through their switch in accounting methodologies.  Def.'s Mem. in Opp'n at 36.

Commerce also points out that the inadvertent result of the change in accounting practice allows LG Semicon and Hyundai to recognize less than one-fifth of the current year's R&D costs as a result of the change in methodology.  Final Results, 64 Fed. Reg. at 69699.  However, in switching from expensing to amortization, a difference in costs will likely occur, as amortization by definition permits the allocation of costs over the market life of the product,[7] while expensing costs during the period incurred necessarily implies a one-time charge.

---

[7] See BLACK'S LAW DICTIONARY (7th ed. 1999). Amortization is defined as the "act . . . of apportioning the initial cost of a usually intangible asset . . . over the asset's useful life." Id.

In evaluating Plaintiffs' cost allocations, Commerce shall also consider whether the accounting methodology has been historically used by the exporter or producer, particularly for establishing appropriate amortization and depreciation periods. See 19 U.S.C. § 1677b(f)(1)(A). While LG Semicon and Hyundai have no immediate historical basis for their preference in amortizing R&D expenses, both companies have amortized R&D costs in the past. In addition, this Court found in Micron that the amortization period afforded by Korean GAAP of three to five years is generally consistent with the actual DRAM life cycle of three and one-half to four years. Micron, 19 CIT at 834, 893 F. Supp. at 29.

In addition to switching to amortization during the review period, Plaintiffs adopted the practice of indefinitely deferring the costs of R&D projects that were not linked to any current production or revenue. Commerce claims that the practice of indefinite deferral of R&D costs is inconsistent with the conservatism principle in accounting. Final Results, 64 Fed. Reg. at 69699. Conservatism in accounting calls for the recognition of expenses when incurred if the probability of associated revenue is remote or uncertain. Id.

Plaintiffs point out that their methodology, which is in accordance with Korean GAAP, does follow the principle of conservatism in accounting. Under Article 70.5 of Korean GAAP,

any unamortized balance remaining for R&D costs will be expensed immediately if the possibility of realizing revenue from a specific R&D project becomes remote.  Pl. Hyundai's Br. at 27.

Only R&D costs that are related to the production and revenue of the subject merchandise for the review period should be included in Commerce's calculations.  See 19 U.S.C. § 1677b(f)(1)(A).  Thus, if R&D expenditures for long-term projects affect the production and revenues for subject merchandise for the review period, those costs should be allocated into the cost of production calculation.  Commerce has not provided specific evidence on the record to show that R&D costs that are currently deferred actually affect production and revenue for this review period.

Accordingly, the Court remands to Commerce to provide specific evidence regarding how Plaintiffs' actual R&D costs for this period of review are not reasonably accounted for in its amortized R&D costs.  The Court also instructs Commerce to provide additional information and to present substantial evidence on the record showing how R&D costs for long-term projects might affect current projects for this review period with respect to deferral.

   3.   **Commerce's Calculation of Hyundai's R&D Cost Allocation
        Ratio Is Reasonable.**

To determine Hyundai's R&D expenses, Commerce calculated the company's R&D allocation ratio by dividing R&D expenses for semiconductors by the cost of semiconductors sold ("COGS") to arrive at a per unit cost of R&D. This formulation of the R&D allocation ratio has been used consistently by Commerce in the past. See Notice of Final Determination of Sales at Less Than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit and Above From Taiwan, 64 Fed. Reg. 56308, 56311-12 (Oct. 19, 1999); Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea: Final Results of Antidumping Duty Administrative, Partial Rescission of Administrative Review and Notice of Determination Not to Revoke Order, 63 Fed. Reg. 50867, 50870 (Sept. 23, 1998); Notice of Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke Order in Part: Dynamic Random Access Memory Semiconductors of One Megabyte or Above from the Republic of Korea, 62 Fed. Reg. 39809, 39823 (Jul. 24, 1997); and Final Determination of Sales at Less Than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit and Above From the Republic of Korea, 58 Fed. Reg. 15467, 15470 (Mar. 23, 1993). Commerce then multiplied the R&D allocation ratio by the cost of semiconductors manufactured ("COM") to determine the R&D expenses for semiconductors.

Hyundai argues that COM instead of COGS should be used in the denominator of the R&D allocation ratio. Differences, if any, between cost of manufacturing and cost of goods sold should generally be "random," since the cost of goods sold should be a *reasonable approximation* of the cost of manufacturing. See Pl. Hyundai's Br. at 37-38. However, Hyundai points out the difference between COGS and COM in this proceeding is not random, but inherent to the DRAM industry in general, as each new generation of DRAMs is more costly to produce than the prior generation due to a consistent trend towards higher density products. Id.

The fact that the use of COGS might reflect historical production costs rather than account for cost increases during the period of review is not reason alone to reject a COGS-based approach to calculating costs. See AIMCOR, Alabama Silicon, Inc. v. United States, 18 CIT 1106, 1116, 871 F. Supp. 455, 463-64 (1994). Moreover, Hyundai has not provided sufficient evidence to show that the extent of the difference between COGS and COM is systematic in nature. See, e.g., Camargo Correa Metais. S.A. v. United States, 21 CIT 1249, 1255-56 (1997) (explaining systematic difference between COGS and COM can occur when historical figures used in COGS may not take into account the rapidly rising costs used to calculate COM during a period of extreme hyperinflation). Hyundai provides data to indicate a constant relationship between

manufacturing costs and the cost of goods sold for the accounting periods of 1995, 1996, 1997, and the first half of 1998 to show that COM is higher than COGS for the company. See Pl. Hyundai's App. 25. The limited data, however, indicates that the differences between the figures are still reasonably close approximations of each other, except for the accounting period of 1997, which happens to overlap with the period of this review.

Accordingly, the Court finds that Commerce reasonably applied COGS to the R&D allocation ratio.

### 4.    Hyundai Does Not Provide Sufficient Evidence of Double Counting by Commerce.

In determining Hyundai's total R&D costs, Commerce included costs incurred by Hyundai Electronics Industries Co., Ltd. ("Hyundai International") for certain long-term R&D projects in addition to expenses incurred by Hyundai Electronics America, Inc. ("Hyundai America"), a subsidiary, for work performed for Hyundai International on a portion of the same R&D projects. Hyundai argues that Hyundai International reimbursed Hyundai America for this R&D work, and therefore the inclusion by Commerce of the costs incurred by Hyundai America should not be counted at all.

Commerce recognizes that Hyundai America received payments from Hyundai International for certain R&D projects. See Def.'s Mem. in Opp'n at 39. However, Hyundai does not provide evidence

of its own records verifying that Hyundai International actually made the payments to Hyundai America. See id. at 39. Hyundai, as plaintiff and possessor of the necessary documents, bears the burden of producing the evidence to provide an accurate record in the antidumping investigation. See Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002) (quoting Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993)). Accordingly, without evidence on the record to determine otherwise, the Court affirms Commerce's determination in the Final Results on this issue.

### 5. Commerce's Treatment of Hyundai's Interest Earned on Severance Deposits Is Reasonable.

In the Final Results, Commerce included the cost of severance payments in Hyundai's labor cost, but did not use the interest income generated from the severance payments as an offset to interest expense. See 64 Fed. Reg. at 69707. Hyundai argues that this interest income should be treated as an offset. See Pl. Hyundai's Br. at 44.

Hyundai contends that the interest income at issue is generated from severance deposits that the company is required to maintain with insurance companies to finance current severance and retirement payments. See Pl. Hyundai's Br. at 43. Furthermore, Hyundai explains that it has chosen to deposit the

full amount of severance benefits with the insurance companies in order to qualify for tax benefits.  Id.

Interest income will be treated as an offset if there is a showing that the interest income is related to the "general operations" of the firm.  Timken Co. v. United States, 18 CIT 1, 9, 852 F. Supp. 1040, 1048 (1994).  Although the income does not have to relate specifically to production of subject merchandise, the interest income should be related to the ordinary operations of the firm.  See id. at 7, 852 F. Supp. at 1046.  Interest income generated from loans and short-term deposits that was "temporarily free" until used to fund the company's business qualifies as an offset.  Id. at 10, 852 F. Supp. at 1049.  Interest income generated from investment activity is generally not allowed as an offset.  NTN Bearing Corp. of America v. United States, 19 CIT 1221, 1237, 905 F. Supp. 1083, 1096 (1995) (Commerce may disallow an offset because no distinction was made between interest income generated from investment activity and manufacturing operations).  However, interest income may be treated as an offset where there is sufficient evidence that the interest income from long-term investment is related to the current operations of a company.  Gulf States Tube Div. of Quanex Corp. v. United States, 21 CIT 1013, 1038, 981 F. Supp. 630, 651 (1997).

In the Final Results, Commerce decided not to treat the interest income generated from the severance benefits as an offset, but did offset interest income earned on collateral deposited with the Korea Development Bank. 64 Fed. Reg. at 69707. The funds deposited with the Korea Development Bank were a prerequisite for Hyundai to receive loans for its business operations, and accordingly, Commerce concluded that the interest income generated was tied to specific loans related to the general operations of the company. In addition, the interest income from the Korea Development Bank deposits served to lower the effective interest rate from banks, thereby decreasing the financing costs of current operations. Id.

Hyundai fails to adequately explain how interest income earned on deposits of severance payments is directly related to current operations. Commerce may treat short-term interest income generated from payroll-related accounts as an offset because the funds are part of working capital accounts necessary for current operations. See Notice of Final Determination of Sales at Less than Fair Value: Certain Preserved Mushrooms from India, 63 Fed. Reg. 72246, 72252 (Dec. 31, 1998). However, payroll expenses do not necessarily include severance pay. See Holland v. Burlington Industries, Inc., 772 F.2d 1140, 1146 (4th Cir. 1985) (distinguishing between severance pay as an "employee welfare benefit plan" available only after termination of

employment and payroll as "general asset compensation during employment"); Matter of Hughes-Bechtol, Inc., 117 BR 890, 902 (Bankr. S.D. Ohio 1990) (explaining "normal gross payroll includes vacation . . . and other group benefits, but excludes severance"). Unlike the funds deposited by Hyundai with the Korea Development Bank that were a requirement to receive loans for business operations, Hyundai chose to deposit the full amount of the severance benefits with the insurance companies in order to receive the maximum benefits of a tax deduction. See Pl. Hyundai's Br. at 43. In light of this reasoning, the Court finds Commerce's position that severance insurance deposits are long-term investments not tied to current operations was not arbitrary or capricious.

Accordingly, the Court affirms Commerce's decision not to treat income interest generated from severance deposits as an offset to Hyundai's interest expense.

## IV. CONCLUSION

For the aforementioned reasons, the Final Results are sustained in part and reversed and remanded in part. Accordingly, Plaintiffs' motion for judgment on the agency record is granted in part and denied in part.

A separate order will be issued accordingly.

/s/ Richard W. Goldberg

**Richard W. Goldberg**
**Senior Judge**

Date:      **April 16, 2004**
           **New York, New York**